

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| _____ | § | |
| | § | |
| **IN RE** | § | **Master File No. 04-MDL-1551** |
| | § | |
| **RECIPROCAL OF AMERICA (ROA)** | § | This Document Relates To: |
| **SALES PRACTICE LITIGATION** | § | |
| | § | **Consolidated Hospital Actions** |
| _____ | § | |

*Crenshaw Community Hosp., et al. v. General Reinsurance Corp., et al.,* **No. 03-CV-2696**
*Gateway Regional Health Sys., Inc. v. General Reinsurance Corp., et al.,* **No. 04-CV-314**
*Delta Regional Medical Center, et al. v. General Reinsurance Corp., et al.,* **No. 06-CV-215**
*Murray Calloway County Hospital v. General Reinsurance Corp., et al.,* **No. 06-CV-2676**

---

## PLAINTIFFS' SECOND AMENDED, RESTATED
## & CONSOLIDATED COMPLAINT

---

COME NOW the Hospital Policyholder Plaintiffs who file this Second Amended & Consolidated Complaint individually and as putative class representatives against the named Defendants. The above-named Plaintiffs and the putative class will hereinafter be collectively referred to as "Plaintiffs." This Amended Complaint is intended to supersede all previous complaints.

### INTRODUCTION

1.      This Complaint is a national class action against the named Defendants for fraudulent misrepresentation, fraudulent suppression, conversion, conspiracy, suppression, Civil RICO, unjust enrichment, negligence and wantonness, breach of fiduciary duties, Professional Negligence, and violation of the Kentucky Consumer Protection Act. The Alabama and Mississippi Hospital Plaintiffs make no claims pursuant to the Kentucky Consumer Protection Act. The class consists of all ROA subscribers who paid a capital-call

contribution to ROA between January 1, 2002, and January 1, 2003 (hereinafter, the "Capital Call").

2. The claims in this action are founded upon the common law and statutory law of the states for fraudulent misrepresentation and suppression, failure to disclose, negligence, wantonness, breach of contract, conspiracy, unjust enrichment, misappropriation/conversion, breach of the covenant of good faith and fair dealing, and other wrongful conduct. The Civil RICO claims are founded upon 18 U.S.C. 1961, *et seq.*

3. Plaintiffs also assert individual claims in this cause for injuries to Plaintiffs. Plaintiffs further assert claims as set out herein on behalf of themselves and other subscribers/putative class members that directly resulted from the named Defendants' wrongful conduct and violation of duties owed to the Plaintiffs and other subscribers/putative class members. Plaintiffs are not asserting causes of action on behalf of the estate of Reciprocal of America ("ROA") or The Reciprocal Group ("TRG") or against ROA/TRG on behalf of themselves or other subscribers/putative class members. Nor are Plaintiffs seeking monetary recovery from ROA/TRG on behalf of themselves or other subscribers/putative class members. Rather, Plaintiffs specifically seek extra-contractual damages and/or other damages and make claims against the named Defendants that are pleaded herein and that fall outside of, and are separate and independent of, the lawsuit brought on behalf of ROA/TRG in November of 2003 by the Deputy Commissioner for ROA/TRG in the United States District Court for the Eastern District of Virginia, Richmond Division, Docket No. 3:03CV955, as well as the Virginia receivership proceeding. However, to the extent that the claims made herein overlap or are similar to the claims of the Virginia receivership, the Tennessee receivership, and/or the receivership lawsuits, the Plaintiffs and other subscribers/putative

class members specifically maintain such claims pleaded herein and further seek recovery for such claims.

4.      Likewise, Plaintiffs are not asserting causes of action on behalf of the estates of Doctors Insurance Reciprocal, Risk Retention Group ("DIR"), American National Lawyers Insurance Reciprocal, Risk Retention Group ("ANLIR"), or The Reciprocal Alliance Risk Retention Group, ("TRA") (hereinafter collectively referred to as the "Risk Retention Groups" or the "RRG's") or against the RRG's on behalf of themselves or other subscribers/putative class members.  Nor are Plaintiffs seeking monetary recovery from the RRG's on behalf of themselves or other policyholders.  Rather, Plaintiffs specifically seek extra-contractual damages and/or other damages and make claims against the named Defendants that fall outside of, and are separate and independent of, the current Tennessee receivership proceeding involving the RRG's.  Plaintiffs' claims and damages in this lawsuit are also separate and independent of the lawsuit brought on behalf of the RRG's by Paula A. Flowers, the Receiver for the RRG's, in the United States District Court for the Western District of Tennessee, No. 04-CV-2078.  However, to the extent that the claims made herein overlap or are similar to the claims of the Virginia receivership, the Tennessee receivership, and/or the receivership lawsuits, the Plaintiffs and other subscribers/putative class members specifically maintain such claims pleaded herein and further seek recovery for such claims.

## JURISDICTION

5.      This Court has original jurisdiction pursuant to:

        a.      28 U.S.C. § 1332, in that the parties in this matter are citizens of different states and the controversy in this matter exceeds $75,000.00;

b.      The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C., § 1965 and 28 U.S.C. § 1331;

c.      28 U.S.C. § 1367, giving this Court supplemental jurisdiction; and

d.      28 U.S.C. § 1407, giving this Court additional jurisdiction under the multidistrict litigation statutory scheme.

## CLASS ACTION ALLEGATIONS

6.      Certification under Rule 23, Fed. R. Civ. P., is proper.

7.      Plaintiffs seek certification of a national class action against all named defendants for the fraudulent suppression, fraudulent misrepresentation, failure to disclose, conspiracy, unjust enrichment, civil RICO, misappropriation/conversion, negligence, wantonness, and other wrongful conduct alleged in this complaint.  The Plaintiffs' class consists of the following:

> All ROA subscribers who paid a capital-call contribution to ROA between January 1, 2002 and January 31, 2003.

8.      The Rule 23 requirements are met because:

a.      The proposed class consists of hundreds of members throughout the United States, and joinder of all members in this action is impracticable.

b.      There are common questions of law or fact to the class, including but not exclusively limited to:

i.  Whether the true financial condition of ROA, solvency and ability to pay medical liability insurance claims, worker's compensation claims, general liability, umbrella, and/or other insurance claims, were suppressed from the Plaintiffs and other subscribers/putative class members.

ii.   Whether the Defendants conspired to and did fraudulently suppress, conceal material facts, and/or misrepresent facts to the Plaintiffs and other subscribers/putative class members, state department of insurance regulators and insurance rating's services such as A.M. Best in order to induce Plaintiffs and other subscribers/putative class members to participate in the Capital Call and to continue seeking coverage and paying premiums to ROA and/or its related entities;

iii.   Whether defendants engaged in a criminal enterprise that adversely affected interstate commerce and whether Defendants participated in a pattern of racketeering activity that damaged the Plaintiffs and subscribers/putative class members;

iv.   Whether Defendant's misappropriated and/or converted the premiums of Plaintiffs and subscribers/putative class members for their own use and benefit;

v.   Whether the Plaintiffs and subscribers/putative class members are entitled to the class wide relief sought in the complaint;

vi.   The existence, terms and significance of the secret side agreements;

vii.   The falsity of and the statements contained in the questionnaires submitted by the Defendants to insurance regulators and insurance rating services;

viii.   The propriety of the accounting practices utilized by the members of ROA and its affiliated entities;

ix.   The conduct of the individual Defendants and of officials, employees, and/or agents of Gen Re;

5

x.   The extent to which funds derived from insurance premiums were improperly diverted to the personal and/or corporate use of individual Defendants and third parties;

xi.   Whether the Defendants constituted an enterprise under 18 U.S.C. §1961, *et seq.* and whether their conduct constituted a violation of 18 U.S.C. §1961, *et seq.*;.

xii.   Whether the Defendants' conduct constituted a violation of 18 U.S.C. §1341 or §1343;

xiii.   Whether the Defendants' conduct constituted a violation of 18 U.S.C. §1961(5);

xiv.   Whether the Defendants' conduct constituted fraud toward state insurance regulators, insurance rating services and/or Plaintiffs and subscribers/putative class members;

xv.   Whether the nature of the Defendants' fraudulent conduct requires disgorgement and restitution;

xvi.   Whether Defendants Milliman and/or PwC's actions or inactions resulted in the amount of money paid by each Plaintiff and policyholder/putative class member for the Capital Call;

xvii.   Whether PwC was negligent, wanton and/or otherwise acted improperly in its audits of ROA and its affiliated entities;

xviii.   Whether Milliman was negligent, wanton and/or otherwise acted improperly in its determination of the amount of claims reserves that each member of ROA and its affiliated entities should have;

xix.   Whether PwC and Milliman breached their fiduciary duties owed to the Plaintiffs and subscribers/putative class members;

xx.   Whether Defendant General Reinsurance's conduct toward Plaintiffs and subscribers/putative class members was fraudulent and/or otherwise improper;

xxi.   Whether General Reinsurance knew that other Defendants, other entities and/or other people were representing that Gen Re would "step into the shoes of ROA" or otherwise pay claims in the event that ROA could not pay claims;

xxii.   Whether the Plaintiffs and/or other subscribers/putative class members attended meeting with ROA management, ROA or other agents and/or

6

employees of Milliman, PwC and General Reinsurance in anticipation of the Capital Call campaign more specifically described below;

xxiii. Whether the actions or inactions of Defendants Milliman and PwC contributed to or in any way affected the Capital Call;

xxiv. Whether the Plaintiffs and the putative class reasonably relied on the misrepresentations of the Defendants to their detriment;.

xxv. Whether Defendants' actions constituted mail and wire fraud;

xxvi. Whether Defendant Milliman was a part of a scheme to defraud the Plaintiffs; and

xxvii. Whether Defendant Sanders knew about ROA's true financial condition prior to the Capital Call.

c. The common questions predominate over any questions affecting only individual members.

d. The claims of the representative parties are typical of each member of the class and are based on or arise out of similar facts constituting the wrongful conduct of the Defendants.

e. A class action is far superior to any other available method.

f. Plaintiffs will fairly and adequately protect the interests of the class *inter alia*:

i. The claims of the Plaintiffs as class representatives are typical of those class members in that plaintiffs were subjected to the same unlawful and/or improper treatment and Plaintiffs suffered the same type of harm as those suffered by other members of the class.

ii. As set forth above, Plaintiffs are hospitals. Plaintiffs will vigorously pursue the claims on behalf of the class, and will fairly and adequately protect the interests of the class.

iii. Plaintiffs have retained experienced legal counsel with substantial experience in civil litigation generally as well as in class action litigation.

iv.    Plaintiffs and subscribers/putative class members paid capital call contributions and purchased substantial insurance coverage from and paid substantial insurance premiums to ROA and its affiliated entities and the insurance purchased with the premiums was reinsured with ROA and Gen Re, and ultimately also with FVR; and accordingly, have suffered substantial damages as a result of the Defendants' conduct.

9.    As to all Defendants, other than Gen Re, Milliman and PwC, the prerequisites of Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure are met in that the available assets of said Defendants combined may well be less than the total damages of the class, and accordingly, adjudications with respect to individual members of the class may as a practical matter be dispositive of the interests of other members of the class who would not be parties to the individual adjudications.

10.    As to Gen Re and the other Defendants, the prerequisites of Rule 23(b)(3) of the Federal Rules of Civil Procedure are met in that questions of law or fact common to the members of the class predominate over any questions affecting only individual members and a class action is superior to other available methods for the fair and efficient adjudication of the controversy *inter alia*:

A.    The expense reasonably anticipated to be involved in pursuing the litigation is substantially greater than a great majority of the class members are in a position to pay or would pay considering the size of individual claims. Further, the size of the claims of a great majority of the class members and the attorneys' time and effort that can reasonably be anticipated to be required in pursuing the litigation are such that it is not economically feasible for a great majority of the class members to retain an attorney on an hourly basis or economically feasible for an attorney to handle a claim of a single hospital on a contingent fee basis.

B.    In that one of the claims involves RICO, it is desirable to concentrate the claims in a federal court.

C.    In that the only individual question should be that of damages, and damages can be mathematically ascertained and may be subject to an automatic payout or claims process, a class action should not present

substantial difficulty beyond that which would be experienced in an individual action.

## PARTIES

11.     This action is brought on behalf of the following policyholder hospitals:  St. Joseph – Mount Sterling d/b/a Mary Chiles Hospital f/k/a Gateway Regional Medical Center, which is a Kentucky corporation with its principal place of business in Montgomery County, Kentucky; T.J. Samson Community Hospital, which is a Kentucky corporation with its principal place of business in Barren County, Kentucky; Murray-Calloway County Hospital which is a Kentucky corporation with its principal place of business in Calloway County, Kentucky; Hardin Memorial Hospital, which is a Kentucky corporation with its principal place of business in Hardin County, Kentucky; Green River Regional Mental Health/Mental Retardation Board, Inc. d/b/a River Valley Behavior Health Hospital, which is a Kentucky corporation with its principal place of business in Daviess County, Kentucky; Harrison Memorial Hospital, which is a Kentucky corporation with its principal place of business in Harrison County, Kentucky; James B. Haggin Memorial Hospital, which is a Kentucky corporation with its principal place of business in Mercer County, Kentucky; Owensboro Mercy Medical Health System, which is a Kentucky corporation with its principal place of business in Davies County, Kentucky; Twin Lakes Regional Medical Center, which is a Kentucky corporation with its principal place of business in Grayson County, Kentucky; Highlands Regional Medical Center with its principal place of business in Floyd County, Kentucky; Caverna Memorial Hospital, Inc. with its principal place of business in Hart County, Kentucky; Clinton County Hospital, Inc. with its principal place of business in Clinton County, Kentucky; Jane Todd Crawford Memorial Hospital with its principal place of business in Green County, Kentucky; Livingston Hospital and Healthcare

Services with its principal place of business in Livingston County, Kentucky; Pattie A. Clay Regional Medical Center with its principal place of business in Madison County, Kentucky; Crenshaw Community Hospital, which is an Alabama corporation doing business in Crenshaw County, Alabama; Bullock County Hospital, which is an Alabama corporation doing business in Bullock County, Alabama; Delta Regional Medical Center, which is a Mississippi community hospital pursuant to § 41-13-10, et. seq. Miss. Code Annotated (1972) with its principal place of business in Washington County, Mississippi; South Sunflower County Hospital, which is a Mississippi community hospital pursuant to § 41-13-10, et. seq. Miss. Code Annotated (1972) with its principal place of business in Sunflower County; Covington County Hospital, which is a Mississippi community hospital pursuant to § 41-13-10, et. seq. Miss. Code Annotated (1972) with its principal place of business in Covington County, Mississippi; Forrest General Hospital, which is a Mississippi community hospital pursuant to § 41-13-10, et. seq. Miss. Code Annotated (1972) with its principal place of business in Forrest County, Mississippi; George County Hospital, which is a Mississippi community hospital pursuant to § 41-13-10, et. seq. Miss. Code Annotated (1972) with its principal place of business in George County, Mississippi; Grenada Lakes Medical Center, which is a Mississippi community hospital pursuant to § 41-13-10, et. seq. Miss. Code Annotated (1972) with its principal place of business in Grenada County, Mississippi; H.C. Watkins Memorial Hospital, Inc., which is a Mississippi community hospital pursuant to § 41-13-10, et. seq. Miss. Code Annotated (1972) with its principal place of business in Clarke County, Mississippi; Hancock Medical Center, which is a Mississippi community hospital pursuant to § 41-13-10, et. seq. Miss. Code Annotated (1972) with its principal place of business in Copiah County, Mississippi; Jeff Anderson Regional Medical Center, which is a Mississippi community hospital pursuant to § 41-13-10, et. seq. Miss. Code Annotated (1972)

with its principal place of business in Jefferson County, Mississippi; King's Daughters Hospital of Brookhaven, which is a Mississippi community hospital pursuant to § 41-13-10, et. seq. Miss. Code Annotated (1972) with its principal place of business in Lincoln County, Mississippi; King's Daughters Hospital of Yazoo City, which is a Mississippi community hospital pursuant to § 41-13-10, et. seq. Miss. Code Annotated (1972) with its principal place of business in Yazoo County, Mississippi; Mississippi Baptist Health System, which is a Mississippi community hospital pursuant to § 41-13-10, et. seq. Miss. Code Annotated (1972) with its principal place of business in Hinds County, Mississippi; Montfort Jones Memorial Hospital, which is a Mississippi community hospital pursuant to § 41-13-10, et. seq. Miss. Code Annotated (1972) with its principal place of business in Attala County, Mississippi; Neshoba County General Hospital, which is a Mississippi community hospital pursuant to § 41-13-10, et. seq. Miss. Code Annotated (1972) with its principal place of business in Neshoba County, Mississippi; Noxubee General Hospital, which is a Mississippi community hospital pursuant to § 41-13-10, et. seq. Miss. Code Annotated (1972) with its principal place of business in Noxubee County, Mississippi; Oktibbeha County Hospital, which is a Mississippi community hospital pursuant to § 41-13-10, et. seq. Miss. Code Annotated (1972) with its principal place of business in Oktibbeha County, Mississippi; South Central Regional Medical Center, which is a Mississippi community hospital pursuant to § 41-13-10, et. seq. Miss. Code Annotated (1972) with its principal place of business in Jones County, Mississippi; Tippah County Hospital, which is a Mississippi community hospital pursuant to § 41-13-10, et. seq. Miss. Code Annotated (1972) with its principal place of business in Tippah County, Mississippi; Walthall County General Hospital, which is a Mississippi community hospital pursuant to § 41-13-10, et. seq. Miss. Code Annotated (1972) with its principal place of business in Walthall County, Mississippi; Wayne

11

General Hospital, which is a Mississippi community hospital pursuant to § 41-13-10, et. seq. Miss. Code Annotated (1972) with its principal place of business in Wayne County, Mississippi; Winston Medical Center, which is a Mississippi community hospital pursuant to § 41-13-10, et. seq. Miss. Code Annotated (1972) with its principal place of business in Winston County, Mississippi; Yalobusha General Hospital, which is a Mississippi community hospital pursuant to § 41-13-10, et. seq. Miss. Code Annotated (1972) with its principal place of business in Yalobusha County, Mississippi (hereinafter collectively referred to as the "Plaintiffs").

12.     The above-named Plaintiffs were subscribers of ROA.  The Plaintiffs seek to represent the interests of all other similarly situated subscribers/putative class members that made capital call contributions in the United States as set out herein.  These other class members are as follows:  HALIFAX REGIONAL HEALTH SYSTEM, INC., POTOMAC HOSPITAL CORPORATION, CMH HEALTH CORPORATION, TWIN COUNTY REGIONAL HEALTHCARE, INC., THE FAUQUIER HOSPITAL, CHILDREN'S HOSPITAL HEALTH SERVICE, SHORE HEALTH SERVICES, INC., DANVILLE REGIONAL HEALTH SYSTEM, RIVERSIDE HEALTHCARE ASSOC., COMMUNITY MEMORIAL HEALTHCENTER, CHESAPEAKE HOSPITAL AUTHORITY, SHENANDOAH MEMORIAL HOSPITAL, INC., MEDICORP HEALTH SYSTEM, PRINCE WILLIAM HEALTH SYSTEM, CHILDREN'S HOSPITAL OF THE KING'S DAUGHTERS HEALTH SYSTEM, SHELTERING ARMS HOSPITAL, AUGUSTA HEALTH CARE, INC., NATIONAL CHILDREN'S REHABILITATION, THE HOSPITAL AUTHORITY OF NORFOLK, JOHNSTON MEMORIAL HOSPITAL, ST.MARY'S HOME FOR DISABLED CHILDREN, WINCHESTER REGIONAL HEALTH SYSTEMS, INC., PSH ACQUISTIONS CORPORATION, OWENSBORO MERCY HEALTH SYSTEM, INC., GRAYSON COUNTY

HOSPITAL FOUNDATION, INC., BRECKINRIDGE MEMORIAL HOSPITAL, JOHNSON

MATHERS HEALTHCARE, CAVERNA MEMORIAL HOSPITAL, INC., MURRAY-

CALLOWAY COUNTY HOSPITAL, TRIGG COUNTY HOSPITAL, INC., HARDIN

MEMORIAL HOSPITAL, T. J. SAMSON COMMUNITY HOSPITAL, CLARK REGIONAL

MEDICAL CENTER, LIVINGSTON HOSPITAL & HEALTHCARE SERV., GATEWAY

REGIONAL HEALTH SYSTEM, JANE TODD CRAWFORD MEMORIAL HOSPITAL, RED

BIRD HOSPITAL, INC., HIGHLANDS REGIONAL MEDICAL CENTER, UNITED

HEALTHCARE OF HARDIN LINCOLN TRAIL HOSPITAL, HARRISON MEMORIAL

HOSPITAL, CLINTON COUNTY HOSPITAL, INC., THE JAMES B. HAGGIN MEMORIAL

HOSPITAL, KENTUCKY ORGAN DONOR AFFILIATES, INC., JENKINS COMMUNITY

HOSPITAL, PATTIE A. CLAY HOSPITAL, GREEN RIVER REG. MENTAL HEALTH /

MENTAL RETARDATION BOARD, INC., CUMBERLAND MEDICAL CENTER, SUMNER

REGIONAL HEALTH SYSTEMS, INC., DECATUR COUNTY GENERAL HOSPITAL,

COFFEE MEDICAL CENTER, LAUGHLIN MEMORIAL HOSPITAL, INC., NORTHCREST

MEDICAL CENTER, COFFEE COUNTY HOSPITAL GROUP, INC., BRADLEY

MEMORIAL HOSPITAL, BAPTIST MEMORIAL HOSPITAL, UNICOI COUNTY

MEMORIAL HOSPITAL, INC., MAURY REGIONAL HOSPITAL, HARDIN COUNTY

GENERAL HOSPITAL, SWEETWATER HOSPITAL ASSOCIATION, THE BAPTIST

HEALTH SYSTEM OF EAST TENNESSEE, MACON COUNTY GENERAL HOSPITAL,

WILLIAMSON COUNTY HOSPITAL DISTRICT, WOODS MEMORIAL HOSPITAL

DISTRICT, SISKIN HOSPITAL FOR PHYSICAL REHAB, THE CITY OF COOKEVILLE,

BEDFORD COUNTY MEDICAL CENTER, WELLMONT HEALTH SYSTEM, CLAIBORNE

COUNTY HOSPITAL, CANNON COUNTY, LLC, ROANE MEDICAL CENTER, BLOUNT

MEMORIAL HOSPITAL, FRANK T. RUTHERFORD MEMORIAL HOSPITAL, INC., BAPTIST MEMORIAL HOSPITAL, WALTHALL COUNTY GENERAL HOSPITAL, ANDERSON INFIRMARY BENEVOLENT ASSOC., MONTFORT JONES MEMORIAL HOSPITAL, INC., HANCOCK MEDICAL CENTER, COVINGTON COUNTY HOSPITAL, TIPPAH COUNTY HOSPITAL, NOXUBEE GENERAL HOSPITAL, CALHOUN HEALTH SERVICES, OKTIBBEHA COUNTY HOSPITAL, JASPER GENERAL HOSPITAL, WAYNE GENERAL HOSPITAL, YALOBUSHA GENERAL HOSPITAL, DELTA REGIONAL MEDICAL CENTER, NORTH MISSISSIPPI HEALTH SERVICES, INC., MISSISSIPPI BAPTIST HEALTH SYSTEMS, INC., GEORGE COUNTY HOSPITAL, NESHOBA COUNTY GENERAL HOSPITAL, GILMORE MEMORIAL HOSPITAL, PEARL RIVER COUNTY HOSPITAL, FIELD MEMORIAL COMMUNITY HOSPITAL, FORREST GENERAL HOSPITAL, SOUTH CENTRAL REGIONAL MEDICAL CENTER, GRENADA LAKE MEDICAL CENTER, RUSH HEALTH SYSTEMS, INC., PRENTISS REGIONAL HOSPITAL, H.C. WATKINS MEMORIAL HOSPITAL, SOUTH SUNFLOWER COUNTY HOSPITAL, WINSTON MEDICAL CENTER, TALLAHATCHIE GENERAL HOSPITAL, TRI LAKES MEDICAL CENTER, SOUTHWEST MISSISSIPPI REGIONAL MEDICAL, KING'S DAUGHTERS MEDICAL CENTER, MORTON MEDICAL CENTER, MAGNOLIA REGIONAL HEALTH CENTER, HUMPHREYS COUNTY MEMORIAL HOSPITAL, HARDY WILSON MEMORIAL HOSPITAL, LAWRENCE COUNTY HOSPITAL, KING'S DAUGHTERS HOSPITAL OF YAZOO COUNTY, SHARKEY-ISSAQUENA COMMUNITY HOSPITAL, CARRAWAY METHODIST HEALTH SYSTEMS, CHEROKEE COUNTY HOSPITAL & NURSING HOME, COOSA VALLEY MEDICAL CENTER, BULLOCK COUNTY HOSPITAL, CRENSHAW COMMUNITY HOSPITAL, DEKALB COUNTY

HOSPITAL ASSOCIATION, SOUTH BUTLER MEDICAL SERVICES, L.L.C., J. PAUL JONES HOSPITAL, LAWRENCE COUNTY HOSPITAL, GULF HEALTH HOSPITALS, INC., RANDOLPH COUNTY HEALTH CARE AUTHORITY, INC. D/B/A WEDOWEE HOSPITAL, TRI-COUNTY MEDICAL CENTER D/B/A ATMORE MEDICAL CENTER, INC., TRI-COUNTY MEDICAL CENTER, INC. D/B/A GEORGIANA MEDICAL CENTER, PIONEER COMMUNITY HOSPITAL OF ABERDEEN AND UNITED FLORALA, INC.

13.     Defendant General Reinsurance Corporation, also d/b/a "General Re," "General Cologne Reinsurance," and "General Cologne Re"  (hereinafter "Gen Re"), is a corporation organized and existing under the laws of the state of Delaware and doing business in the Commonwealth of Kentucky, the State of Alabama, the State of Mississippi and other states. Gen Re is liable for the actions and omissions of its executives, Thomas M. Reindel, Tom N. Kellogg, Victoria J. Seeger and Christopher J. Migel, as well as its officers, directors, employees and agents under the doctrines of agency, respondeat superior, sub-agency and/or other doctrines.

14.     Defendant Thomas M. Reindel was at all times relevant a Vice President of Gen Re.  Gen Re is liable for the actions and omissions of Reindel and its other employees and agents under the doctrines of agency, respondeat superior, sub-agency and/or other doctrines. Defendant Reindel is also individually liable for the wrongful conduct alleged throughout the course of this Second Amended & Consolidated Complaint.

15.     Defendant Tom N. Kellogg was at all times relevant a Vice President of Gen Re. Gen Re is liable for the actions and omissions of Kellogg and its other employees and agents under the doctrines of agency, respondeat superior, sub-agency and/or other doctrines.

Defendant Kellogg is also individually liable for the wrongful conduct alleged throughout the course of this Second Amended & Consolidated Complaint.

16.     Defendant Victoria J. Seeger *(f/k/a Victoria J. Wixtead)* was at all times relevant a Vice President of Gen Re.  Gen Re is liable for the actions and omissions of Seeger and its other employees and agents under the doctrines of agency, respondeat superior, sub-agency and/or other doctrines.  Defendant Seeger is also individually liable for the wrongful conduct alleged throughout the course of this Second Amended & Consolidated Complaint.

17.     Defendant Christopher J. Migel was at all times relevant an Executive Vice President of Gen Re. Gen Re is liable for the actions and omissions of Migel and its other employees and agents under the doctrines of agency, respondeat superior, sub-agency and/or other doctrines.  Defendant Migel is also individually liable for the wrongful conduct alleged throughout the course of this Second Amended & Consolidated Complaint.

18.     Defendant Milliman USA, Inc. ("Milliman") (f/k/a Milliman & Robinson) is a corporation organized and existing under the laws of the State of Washington and doing business in the Commonwealth of Kentucky, the State of Alabama, the State of Mississippi, the State of Tennessee, the Commonwealth of Virginia and other states.  Milliman is liable for the actions and omissions of Sanders and its other employees and agents under the doctrines of agency, respondeat superior, sub-agency and/or other doctrines.

19.     Defendant Robert L. Sanders was at all times relevant a principal of Milliman. Defendant Sanders is individually liable for the wrongful conduct alleged throughout the course of this Second Amended & Consolidated Complaint.

20.     Defendant PricewaterhouseCoopers LLP ("PwC") is a limited liability partnership organized and existing under the laws of the State of Delaware and doing business in the

Commonwealth of Kentucky, the State of Alabama, the State of Mississippi, the State of Tennessee, the Commonwealth of Virginia and other states. PwC is liable for the actions and omissions of Defendant Gary Stephani and its other employees and agents under the doctrines of agency, respondeat superior, sub-agency and/or other doctrines.

21.     Defendant Gary Stephani ("Stephani") was at all times relevant a partner with PwC. Defendant Stephani is individually liable for the wrongful conduct alleged throughout the course of this Second Amended & Consolidated Complaint.

22.     Defendant Wachovia Bank, National Association ("Wachovia") (f/k/a First Union National Bank) is a corporation organized and existing under the laws of the Commonwealth of Virginia and doing business in the Commonwealth of Kentucky, the State of Alabama, the State of Mississippi, the State of Tennessee, and other states. Wachovia is liable for the actions and omissions of its employees and agents under the doctrines of agency, respondeat superior, sub-agency and/or other doctrines.

23.     Collectively, Defendants Kellogg, Seeger, Migel, Reindel, Sanders, Gen Re and Milliman may be referred to herein as the "RICO Defendants."

## FACTS

### I.  THE HISTORY OF THE ENTITIES AND THEIR RELATIONSHIP

24.     Reciprocal of America ("ROA") is a Virginia unincorporated association and reciprocal insurer. The Reciprocal Group ("TRG") is a Virginia non-stock corporation. TRG ostensibly served as the management company and attorney-in-fact for ROA. On January 29, 2003, the Circuit Court of the City of Richmond, Virginia, found that "ROA and TRG, as attorney-in-fact for ROA, operate as, and comprise, a single insurance business enterprise." As used in this Complaint "ROA/TRG" refers to the combined single business enterprise.

25.     ROA was formed in 1977 as Virginia Hospital Insurance Reciprocal.  Over the years, ROA underwent two name changes, becoming known as Reciprocal of America in 2001. ROA initially provided insurance only to hospitals.  Later, ROA also began to insure physicians and lawyers and provide reinsurance coverage to DIR, ANLIR, and TRA.

26.     First Virginia Reinsurance ("FVR") was incorporated in Bermuda in 1984.  FVR was originally intended to serve as a reinsurer of all of ROA's retained share of risk on the physician and lawyer malpractice insurance business. The initial purpose of FVR was to allow ROA's lawyer and physician insureds to defer the payment of federal income taxes.  This had the further effect of limiting regulatory oversight of the various transactions entered into by the Defendants.

27.     FVR was referred to by certain of the Defendants as "Gen Re II" or "GR2."

28.     25% of FVR was originally owned by ROA and 75% by certain Virginia hospitals and health care systems which were direct subscriber/insureds of ROA.  In early 1989, the 75% owners of FVR purchased ROA's 25% minority interest.  This transfer was engineered by ROA management who feared that Virginia insurance regulators might determine that ROA and FVR constituted an insurance holding company system, which would require adherence to additional rigorous regulations and subject the companies to additional regulatory scrutiny.

29.     ROA Management, with the assistance of other Defendants, devised a plan further to remove FVR from potential regulatory scrutiny.  Pursuant to this plan, ROA's FVR-reinsured risk would be reinsured first by Gen Re and then be retroceded to FVR.  ROA would then report, and would claim a reinsurance credit for, the reinsurance with Gen Re, and thereby be relieved of the requirement to report the reinsurance with FVR, thus distancing it from the scrutiny of the regulators of ROA.  This plan was implemented beginning in 1989, when Gen Re began to pass

ROA risk, both direct and reinsurance, through to FVR pursuant to retrocession agreements between Gen Re and FVR (the "Gen Re-FVR Retrocession Agreements").  Gen Re actively participated in the conspiracy to keep the true nature of the ROA-FVR relationship hidden from insurance regulators, insurance rating agencies and the Plaintiffs/putative class.

30.     FVR and Gen Re were also parties to certain trust agreements for the purpose of holding assets in Bermuda financial institutions as security for the performance of FVR's obligations under the Gen Re-FVR Retrocession Agreements (the "FVR Bermuda Trusts").

31.     ROA management asked Gen Re to act as an intermediary between ROA and FVR.  This was a condition to Gen Re's continuing to participate in the very profitable supposed reinsurance of ROA's business.

32.     In 1989 or 1990, the board of Directors of ROA authorized the management of TRG to form Doctors Insurance Reciprocal, Risk Retention Group.  DIR was to insure ROA's physician line of insurance business.  DIR was formed in 1990 and domiciled and licensed in Tennessee.  After a period of transition, DIR began directly writing the insurance for the physician line of insurance business previously insured by ROA.

33.     In 1992, the Board of Directors of TRG authorized the management of TRG to form American National Lawyers Insurance Reciprocal, Risk Retention Group.  ANLIR was to insure ROA's lawyer line of insurance business.  ANLIR was formed in 1992 and was domiciled and licensed in Tennessee in 1993.  After a period of transition, ANLIR began directly writing the insurance for the lawyer line of insurance business previously insured by ROA.

34.     In 1995, the Board of Directors of TRG authorized the management of TRG to form The Reciprocal Alliance, Risk Retention Group.  TRA was to insure health care providers

in markets that ROA was unable to reach due to regulatory restrictions. TRA was formed in 1995 and was domiciled and licensed in Tennessee.

## II.  REINSURANCE RELATIONSHIPS AMONG ROA AND THE RRGs

35.    FVR engaged in providing insurance through directly or indirectly reinsuring; that is, assuming a portion of the risk of affiliated companies (all collectively referred to herein as "The Risk Retention Group") which companies include The Reciprocal Alliance (Risk Retention Group) ("TRA"), a Tennessee corporation; Reciprocal of America ("ROA"), a Virginia corporation, formerly known as The Virginia Insurance Reciprocal ("TVIR"); Doctors Insurance Reciprocal (Risk Retention Group) ("DIR"), a Tennessee corporation; and American National Lawyers Insurance Reciprocal (Risk Retention Group) ("ANLIR"), a Tennessee corporation.

36.    From its inception, ROA entered into a reinsurance arrangement with Gen Re, whereby ROA ceded to Gen Re a portion of ROA's risk under ROA's insurance policies. After the RRGs were formed, ROA entered into a retrocession arrangement with Gen Re further to transfer the insurance risk of DIR, ANLIR, and TRA that had been ceded by the RRGs to ROA. All of this transfer of risk to Gen Re, including risk ceded to ROA by DIR, ANLIR, and TRA, was encompassed within the reinsurance arrangement with Gen Re.

37.    As originally structured and disclosed to regulators, Plaintiffs and subscribers/putative class members, the reinsurance treaties between ROA and Gen Re appeared to have constituted a legal, legitimate business practice. As a result of ROA's reinsurance treaties with Gen Re, ROA received a considerable financial reporting credit that had material favorable impact on its financial statements.

38.    The reinsurance treaties among and between ROA, DIR, ANLIR, TRA, and Gen Re were disclosed to regulators, Plaintiffs, subscribers/putative class members and to the public

and were further disclosed in <u>Best's Insurance Reports</u>.  However, as discussed further below, Milliman and PwC fraudulently misrepresented and/or failed to disclose material facts to the above entities or to regulators or to <u>Best's Insurance Reports</u>, and did not obtain prior written approval from Tennessee or Virginia regulators of, certain "non-contractual understandings," "side letters," and other agreements purporting to modify the reinsurance treaties between the companies and Gen Re, and the Gen Re-FVR Retrocession Agreements. The non-disclosures were fraudulent and, in some cases, violated statutes requiring prior written approval of certain transactions. The non-disclosures were the proximate cause of economic damages to Plaintiffs and subscribers/putative class members.

### III.  RELATIONSHIPS AMONG ROA AND KENTUCKY SELF INSURANCE PROGRAMS AND THE COASTAL INSURANCE ASSOCIATION

39.    Kentucky Hospital Association Trust ("KHAT"), a group self-insurer for hospital professional and general liability, was formed in 1978.

40.    Compensation Hospital Association Trust ("CHAT"), a group self-insurer for hospital worker's compensation coverage, was also formed in 1978.

41.    Coverage Options Associates ("COA") was established in 1979 to serve as Third Party Administrator for KHAT and CHAT.

42.    KHAT and CHAT were merged/consolidated with ROA in November of 1997. COA was retained to serve as the Third Party Administrator through November of 2002.  The Kentucky Plaintiffs obtained worker's compensation, professional, general and umbrella liability insurance with ROA through the Kentucky self-insurers.

43.    Prior to the KHAT and CHAT's merger with ROA in 1997, KHAT and CHAT's Kentucky hospitals were already reinsured through Gen Re.  As part of this relationship, Gen Re

provided guidance and direction to KHAT and CHAT's Board of Directors regarding underwriting claims and other advice related to financial and management issues.  This was an open-ended relationship in which Gen Re contributed considerable input.  KHAT and CHAT trusted and relied on the advice of Gen Re.  When KHAT and CHAT were considering their merger with ROA in 1997, members of KHAT and CHAT's Board of Directors consulted agents and employees of Gen Re seeking their advice as to whether they were familiar with ROA and whether they had a favorable opinion of ROA.  Agents and representatives of Gen Re told KHAT and CHAT that it would be beneficial for them to merge with ROA claiming that ROA was stable financially and was a sound operation with a good management structure.

44.    Coastal Insurance Association ("CIA"), an Alabama group self-insurer for hospital professional and general liability insurance for the Alabama Hospital Association Trust ("AHAT"), merged with ROA in 2000.  The Alabama Plaintiffs obtained professional, general and umbrella liability insurance with ROA through the CIA/AHAT self-insurer.  Prior to the CIA/AHAT's merger with ROA in 2000, AHAT's Alabama hospitals were already reinsured through Gen Re.  As part of this relationship, Gen Re provided guidance and direction to AHAT's Board of Directors regarding underwriting claims and other financial and management advice.  This was an open-ended relationship in which Gen Re contributed considerable input. AHAT trusted and relied on the advice of Gen Re.  When CIA/AHAT was considering the merger with ROA in 2000, members of AHAT's Board of Directors consulted agents and employees of Gen Re seeking their advice as to whether they were familiar with ROA and whether they had a favorable opinion of ROA.  Agents and representatives of Gen Re told CIA/AHAT that it would be beneficial to merge with ROA claiming that ROA was stable financially and was a good operation with a good management structure.

## IV.  GENERAL ALLEGATIONS

45.     There existed a conspiracy among the Defendants, as well as other wrongful acts engaged in by various Defendants, all of which resulted in the ultimate financial failure of ROA/TRG, which in turn caused damages to Plaintiffs and subscribers/putative class members as set out herein.

46.     ROA had become insolvent well before January 29, 2003.  The RICO Defendants and others engaged in a complex conspiracy of fraudulent schemes to conceal ROA's financial deterioration from subscribers, members, insureds, policyholders, creditors, regulators, Plaintiffs, subscribers/putative class members and the public.  As a consequence, ROA management was able to cause ROA to continue issuing new policies and undertaking additional debt, thereby exacerbating ROA's financial impairment to the point of, and driving ROA ever deeper into, insolvency.  By the time ROA was placed into receivership, ROA's liabilities exceeded its admitted assets by approximately $200 million.  This figure has since been revised upwards. The substantial majority of these liabilities consists of obligations by ROA to pay claims of policyholders.  ROA management, Defendant Gen Re, Defendant PwC, Defendant Milliman, Sanders and others, either directly or indirectly, were responsible for the Capital Call, which caused damages to Plaintiffs and subscribers/putative class members.

### A.     The Conspiratorial Relationship: Rebates paid to ROA

47.     Gen Re's reinsurance of ROA through 1990 had been so lucrative that ROA management succeeded in demanding rebate of a portion of Gen Re premiums from prior reinsurance contracts as a condition of renewing or entering into new reinsurance treaties with Gen Re.

48.     On December 11, 1991, ROA management (in Virginia) used wire communication to send Kellogg (in Connecticut) a draft "comfort" letter (the "1992 Unreported Side Agreement"), as an addition to the ROA-Gen Re Stabilization Treaty.  ROA management sent the proposed draft to Gen Re so that Gen Re could transfer the letter to Gen Re letterhead, and Kellogg could sign the letter and return it to ROA.

49.     On January 6, 1992, ROA management (in Virginia) sent another draft of the 1992 Unreported Side Agreement to Kellogg (in Connecticut) through the U.S. Mail.

50.     Although the 1992 Unreported Side Agreement purported to be a "legally binding agreement," it stated that it was intended "FOR [CREWS'] EYES ONLY" and was "not to be shared with anyone" at ROA, TRG, or DIR except in William Crews' sole discretion.  It recited that Gen Re would rebate at least $9.5 million of ceded premiums back to ROA, because such payment was "required to help stabilize the [ROA/Gen Re] relationship."  As consideration for "the continued cession of reinsurance business to [Gen Re] on terms mutually acceptable to [ROA and Gen Re]," Gen Re would rebate an additional $6 million of ceded premiums back to ROA, for a total rebate of $15.5 million from 1991 to 1996.

51.     The 1992 Unreported Side Letter Agreement was executed by Gen Re and William Crews (on behalf of ROA) and transmitted using the wires and payments were made by Gen Re to ROA pursuant to the Agreement.

52.     $3.5 million of those rebates was never deposited in any ROA account.  The Plaintiffs further allege that neither ROA nor Gen Re correctly reported the rebates in financial statements or otherwise.

53.     The 1992 Unreported Side Agreement was the beginning of a long pattern by the RICO Defendants of engaging in unreported transactions in order to evade regulatory scrutiny

and maximize benefits to themselves, which ultimately led to injury to the Plaintiffs and subscribers/putative class members.

### B.   Gen Re Loans to FVR Misrepresented as Reinsurance

54.   ROA management and/or others, with the complicity and cooperation of Reindel at Gen Re and others, engaged in a scheme to make loans from Gen Re to FVR, but to disguise and misrepresent those loans as reinsurance.  The "reinsurance" agreements were intended to inflate artificially and improperly FVR's surplus for the business originally written by the RRGs, reinsured by ROA, and then retroceded to Gen Re.  This is so-called "pass-through" reinsurance. That is, this is the portion of the RRG ceded reinsurance that was ceded from the RRGs to ROA and in turn "passed through" to Gen Re and was in turn retroceded ("passed through" again) to FVR.  The intent of these "reinsurance" agreements was to deceive regulators, Plaintiffs and subscribers/putative class members regarding FVR's ability to satisfy its obligations as a reinsurer of Gen Re.

55.   The parties also intended that Gen Re would incur no substantial insurance risk of net loss to itself, in that FVR's obligations under the Gen Re loans would be guaranteed by ROA, and Gen Re's purported "reinsurance" of ROA for this pass-through business was merely an accommodation.  ROA management and other Defendants concealed from regulators, the Plaintiffs/putative class and others ROA's guaranty of FVR's obligations to Gen Re, thereby misrepresenting and falsely stating the financial condition of ROA.  If the regulators had known the true financial condition of ROA, ROA would not have been permitted to continue to operate and, because of the dependence of the RRGs on ROA, the RRGs also would not have been permitted to operate.  If the Plaintiffs had known this material information, the Plaintiffs would not have contributed to the Capital Call as set out, *infra*.

56.     The RICO Defendants made use of wire and mail communications in negotiating and implementing the loans from Gen Re to FVR, and the guaranty by ROA.

57.     ROA management made false statements on ROA's Annual Statements for 1998, 1999, 2000, and 2001, asserting that ROA had no material contingent liabilities even though ROA had contingent liabilities to reimburse Gen Re for the sham reinsurance.   These false statements were in furtherance of the conspiracy, which included the Defendants and others as set out herein.   These false statements were material and were violations by ROA management of 19 U.S.C. § 1033(a) and 1033(c), and/or other statutes and regulations, which violations ultimately led to injury to the Plaintiffs.

**C.      $10 Million Fraudulently Transferred from ROA to FVR Trusts**

58.     Seeger, Kellogg, Reindel, ROA management and/or others conspired to make a disguised transfer of $10 million from ROA to the FVR Bermuda Trusts.   After the transfer occurred, it was falsely accounted for by ROA as a pre-payment of reinsurance payments to Gen Re.

59.     If the payment had not been disguised, the Virginia regulators and the Plaintiffs/putative class could have discovered the schemes employing undisclosed rebates and sham reinsurance.   If the Virginia regulators had discovered these schemes, they would have discovered that ROA's Surplus to Policyholders had been overstated by over $10 Million on its 2000 Annual Statement.

60.     As a result of the overstatement of ROA's Surplus to policyholders, the RRGs' 2000 Annual Statements filed with TDCI also fraudulently overstated Surplus to Policyholders.

61.     These false statements regarding the accounting for the $10 million were material and were violations by ROA management of 18 U.S.C. 1033§§ (a) and 1033(c), and/or other

statutes and regulations, and were made in furtherance of the conspiracy including Gen Re and the other Defendants, which ultimately led to injury to the Plaintiffs.

62.     When PwC began to question the $10 million transfer, ROA management enlisted the assistance of Seeger and Wachovia in convincing PwC that the transfer should be treated as an ROA asset.  PwC thereafter failed to require ROA to non-admit (that is, not to count as an asset) the $10 million "prepaid premiums," even though PwC knew, or should have known, that this was a false entry, and that it had a duty to impose such a requirement upon ROA.

63.     The RICO Defendants made use of wire and mail communications in devising and implementing the $10 million transfer from ROA to the FVR Trusts.

**D.     False Recording of "Assets" on ROA's Financial Statements**

64.     ROA management had a regular practice of re-characterizing liabilities as "assets" whenever needed to fraudulently boost surplus to policyholders shortly before filing quarterly or annual statements.   The purpose of these fraudulent characterizations was to enable ROA management to report ROA's, DIR's, ANLIR's, and TRA's Surplus to Policyholders as being above the RBC percentage calculated as 200% of Authorized Control Level ("ACL," which is half of the RBC), thereby avoiding enhanced regulatory scrutiny.[1]

65.     These false entries were material and constituted violations of 18 U.S.C. §§ 1033(a) and 1033(c), and were made in furtherance of the conspiracy including Gen Re and the other Defendants, which ultimately led to injury to the Plaintiffs.

---

[1] Risk Based Capital ("RBC") is the result of a method that attempts to determine the surplus required to support the business written by an insurance company, given the characteristics of the insurance company's assets.  A complex calculation produces an estimate of the required capital.  The Authorized Control Level ("ACL") is equal to one-half of this capital or surplus requirement.  Actions by the domiciliary insurance department are predicated on the ratio of actual surplus to ACL.  If the ratio is above 200%, no action is contemplated.  A ratio between 150% and 200% is "company action level," at which the company is required to take corrective action.  If the ratio is between 100% and 150%, regulatory action is authorized.  If the ratio is less than 100%, regulatory intervention is required.

### E.       Arbitrary Reserve Write-Downs

66.     ROA management caused DIR and ROA to engage in arbitrary and improper reserve write-downs for loss and loss adjustment expenses, which resulted in the financial statements for DIR and ROA showing artificially high Surplus to Policyholders that in turn overstated the Risk Based Capital ("RBC") percentages.   These artificially high RBC percentages had the effect of concealing from the regulators the true financial condition of DIR and ROA.  If the regulators had known the true condition of DIR and ROA, the regulators would not have allowed DIR and ROA to continue to operate.   If the Virginia authorities had not permitted ROA to continue to operate, the Tennessee regulatory authorities would in addition not have permitted ANLIR and TRA to continue to operate.   If this information had been disclosed, the Plaintiffs/putative class would not have contributed to the Capital Call, as set out, *infra.*

67.     Furthermore, the reserve write-downs occurred on several occasions shortly before quarterly and annual financial statements were due to be filed, and were backdated so that the statements for periods already ended would report Total Adjusted Capital in excess of 200% of ACL, the level below which company action would have been required.   ROA management would instruct claims personnel to reduce large case reserves without any reasonable basis for doing so and without regard to claims case reserving policies.  Instead, the amount of the reserve write-downs was outcome-driven by the amount needed to keep Total Adjusted Capital in excess of 200%.  Milliman and PwC were made aware of this policy and practice at ROA.  Instead of alerting regulators or Plaintiffs, Gen Re chose to actively conceal this information to maintain its lucrative financial relationship with ROA.

68.     In April 1995, January 1998, December 1998, December 1999, and October 2000, ROA management directed claims personnel to reduce DIR claims, and in each instance to

backdate the reductions for purposes of upcoming DIR Quarterly and Annual Financial Statements to be filed with the TDCI and, because of the reinsurance relationship, for purposes of ROA's Quarterly and Annual Financial Statements to be filed with the Virginia SCC. The total amount of these reserve write-downs was in excess of $6.5 million. The claims write-downs were made without examination of the claims filed by claims adjusters pursuant to established claims review policies and there was therefore no legitimate basis for the claims write-downs. As a result of the claims write-downs, ROA's Surplus to Policyholders was fraudulently overstated by approximately $2.3 million in the March 1995 Quarterly Statement, $2 million in the 1997 Annual Statement, and $300,000 in the 1998 Annual Statement, and $1 million in the September 2000 Quarterly Statement. DIR's Surplus to Policyholders was similarly overstated in the corresponding Quarterly and Annual Statements filed with the TDCI.

69.     In addition to the effect of the write-down of DIR reserves on ROA, the write-down also impacted the RBC calculation for DIR. The acknowledged $2.1 million write-down for 2001 was sufficient to put the ratio of policyholder surplus to ACL above 200%, and keep DIR from immediate regulatory scrutiny.

70.     Furthermore, in November 2000, January 2001, and November 2001, ROA management directed claims personnel to reduce ROA claims, and in each instance to backdate the reductions for purposes of upcoming Quarterly and Annual Financial Statements to be filed with the Virginia SCC. The total amount of these reserve write-downs was in excess of $30 million. The claims write-downs were made without examination of the claims files by claims adjusters pursuant to established claims review policies and there was therefore no legitimate basis for the claims write-downs. As a result of the claims write-downs, ROA's Surplus to Policyholders was fraudulently overstated by approximately $5.4 million in the September 2000

Quarterly Statement, $5.8 million in the 2000 Annual Statement, and $25.8 million in the September 2001 Quarterly Statement.

71.     Also, ANLIR and TRA each reported reserve write-downs in their 2001 annual statements.  The write-down of reserves also impacted the RBC calculation for ANLIR.  The acknowledged $330,000 write-down for 2001 was sufficient to put the ratio of policyholder surplus to ACL above 200% and keep ANLIR from immediate regulatory scrutiny.  The reserve write-down for TRA in 2001 was $5 million.  While this write-down was substantial and translated into a significant impact on policyholder surplus, the surplus of TRA would have been above the 200% of ACL level even without the write-down.

72.     Gen Re, and Milliman and Sanders were aware that DIR and ROA were under-reserved as early as December 1999.  Defendant Milliman, either directly or indirectly, was responsible for the under-reserving of DIR and ROA as set out in paragraphs 38, 46, 73, 94-100, 116-118, 126-128, 143-166, 176-189 herein.

73.     Due to the improper reserve write-downs, the annual and quarterly statements filed on behalf of ROA, DIR, and ANLIR were materially false and constituted violations of 18 U.S.C. §§ 1033(a) and 1033(c), and/or other statutes and regulations, and were falsely made in furtherance of the conspiracy including Gen Re, Milliman, Sanders, and the other Defendants, which ultimately led to injury to the Plaintiffs.

## V.  SIDE LETTER AGREEMENTS

### A.     The 2000 Unreported Side Letter Agreement

74.     Early in the year 2000, the RICO Defendants became aware that premiums charged under DIR policies in prior years had been inadequate, and/or that losses being experienced were more severe than had been predicted.  Gen Re became concerned that the FVR

Bermuda Trusts were inadequately funded to cover FVR's obligations to Gen Re under the Gen Re-FVR Retrocession Agreements, and that the extent of Gen Re's insurance risk of net loss was greatly increased. The RICO Defendants conspired, through the use of a fraudulent and unreported side agreement, to limit or eliminate Gen Re's reinsurance risk of loss, while maintaining the illusion that Gen Re continued to bear a substantial insurance risk of net loss under the Gen Re/ROA reinsurance treaties.

75.    Reindel and others, on behalf of Gen Re, therefore proposed a scheme involving an aggregate cap that would limit Gen Re's reinsurance risk of loss under the Gen Re/ROA reinsurance treaties.  This scheme was intended to allow ROA to continue claiming a credit for its reinsurance with Gen Re, undiminished by the effect of the cap, which would not be disclosed to regulators, Plaintiffs and subscribers/putative class members.

76.    A cap on Gen Re's obligations to ROA had the potential and did in fact diminish the surplus of ROA, which diminished the security for the reinsurance available to the RRGs.  It thereby effectively destroyed the reinsurance available to the RRGs, since the RRG reinsurance with ROA had been passed-through to Gen Re.

77.    The RICO Defendants hoped that they could yet avoid discovery of the deteriorating financial condition of ROA, and therefore of each of the RRGs, by evading the enhanced regulatory monitoring that would be triggered if ROA's RBC or the RBC of any RRG fell to a level low enough to require regulatory intervention.

78.    By letter dated November 16, 2000, Seeger used mail or wire communication to send what she referred to as "a finalized side-letter agreement" (the "2000 Unreported Side Agreement") from Gen Re's offices in Connecticut to ROA's offices in Virginia.   This communication was copied to Gen Re's Migel and Kellogg.

79.     The 2000 Unreported Side Agreement was dated as of November 11, 2000.  Gen Re executed the Agreement on December 15, 2000.  On December 28, 2000, ROA management executed the Agreement.

80.     Seeger knew as early as 1997 that unreported side agreements were illegal under Virginia law, having received a January 10, 1997, email from a Gen Re employee quoting the relevant statute.  Seeger forwarded the email by facsimile to ROA management on January 28, 1997.

81.     Pursuant to the 2000 Unreported Side Agreement, Gen Re's liability for payments made by ROA at and after 12:01 a.m., January 1, 2000, for Net Loss and Adjustment Expense under all Subject Reinsurance Agreements combined, purported to be limited to the sum of $140 million plus 100% of the reinsurance premium ceded by ROA, net of commission, for calendar year 2000 under Agreements of Reinsurance No. A456 and No. A481 (the "$140 Million Cap").

82.     For purposes of the 2000 Unreported Side Agreement, the Subject Reinsurance Agreements included reinsurance agreements between ROA and Gen Re for business written by ROA, and also reinsurance agreements between ROA and Gen Re for business written by the RRGs and assumed by ROA under reinsurance agreements with the RRGs.[2]

83.     Neither ROA nor any of the RRGs received any consideration for agreeing to the $140 Million Cap, nor were the independent Directors of ROA or the RRGs privy to the arrangement.

---

[2]  The applicable agreements were stated as Agreements of Reinsurance No. A238 between ROA and Gen Re; No. A273 between ROA and Gen Re (applying to business assumed by ROA from DIR under Agreement No. A 1993 between ROA and DIR); No. A289 between ROA and Gen Re (applying to business assumed by ROA from ANLIR under Agreement No. B 1993 between ROA and ANLIR); No. A442 between ROA and Gen Re (applying to business assumed by ROA from TRA under Agreement No. A1995 between ROA and TRA); No. A456 between ROA and Gen Re; and No. A48l between ROA and Gen Re.

84.    In ROA's Annual Statement for the Year 2000, which was filed with TDCI on or about March 2001, and relied upon by the Virginia regulators and the Plaintiffs, ROA management (with the knowledge and complicity of Gen Re) answered falsely under oath "No" to the following general interrogatories:

> 15.(a) Has this company reinsured any risk with any other company under a quota share reinsurance contract which includes a provision which would limit the reinsurer's losses below the stated quota share percentage (e.g., a deductible, a loss ratio corridor, a loss ratio cap, an aggregate limit or any similar provision?)
>
> 16.(a) Has this company reinsured any risk with any other company and agreed to release such company from liability, in whole or in part, from any loss that may occur on the risk, or portion thereof, reinsured?

85.    ROA management made similar misrepresentations in ROA's subsequent quarterly financial statement and in ROA's 2001 Annual Statement (and amended 2001 Annual Statement).

86.    These false statements were material, were intended to deceive, were violations by ROA management of 18 U.S.C. §§ 1033(a) and 1033(c), and were made in furtherance of the conspiracy including Gen Re and the other Defendants.

87.    Contemporaneously with their being filed, ROA management mailed a copy of the 2000 Annual Statements of ROA and each of the RRGs to Defendant Gen Re.  Defendants Reindel, Seeger, and Kellogg therefore had actual knowledge that ROA management had not reported the 2000 Unreported Side Agreement.

88.    The 2000 Unreported Side Agreement, like the other schemes and arrangements alleged herein, evinces the pattern of racketeering activity engaged in by the RICO Defendants

for the purpose of evading regulatory scrutiny in furtherance of maximizing benefits to themselves, which ultimately led to injury to the Plaintiffs.

### B.    The 2002 Unreported Side Agreement

89.     In furtherance of their continuing conspiracy, in May of 2001, the RICO Defendants discussed limiting further, through a new fraudulent and unreported side agreement, Gen Re's reinsurance risk of loss under the Gen Re/ROA reinsurance treaties.

90.     In October 2001, Seeger, Migel, and Kellogg began proposing various drafts of a side agreement to replace the 2000 Unreported Side Agreement.

91.     By wire transmission dated January 4, 2002, ROA management distributed the final draft of a reinsurance "white paper" that had been sent on January 3, 2002, to members of ROA's Executive Committee.  As reflected in the "white paper," the RICO Defendants became increasingly concerned that premiums charged for the physician book of business starting in about 1997 were even more inadequate, and/or that losses being experienced were even more severe, than they had feared in 1999, resulting in FVR having "a minimum amount of surplus." Based on this new information, Gen Re proposed a new fraudulent scheme pursuant to which ROA would enter into several related agreements as part of a step transaction with Gen Re and FVR in and after March of 2002, effective retroactively as of December 31, 2001, or January 1, 2002, depending on the agreement.  Collectively, the agreements comprising the step transaction were referred to as the "Loss Portfolio Transfer."    101.    Pursuant to the Loss Portfolio Transfer, FVR commuted to Gen Re all of FVR's liabilities and obligations under the Gen Re-FVR Retrocession Agreements.  In exchange for the commutation of liabilities and obligations under the Gen Re-FVR Retrocession Agreements, FVR paid Gen Re a commutation payment of $112,998,000 from the FVR Bermuda Trusts, which was intended to cover Gen Re's potential

liability for the commuted risk, attributable to the pre-2002 claims.  Gen Re agreed to release to FVR's control another $11 million of assets that had been in the FVR Bermuda Trusts (the "Pre-2002 Trust Balance").

92.     As part of the Loss Portfolio Transfer, Gen Re ceased accepting reinsurance from ROA, including the pass-through reinsurance from the RRGs, for the primary layers that it had previously accepted and ceded to FVR.  ROA and Gen Re executed Reinsurance Agreement A593, effective December 31, 2001, whereby Gen Re agreed to reinsure ROA for claims made by insureds of DIR, ANLIR, or TRA in 2002 through 2005, if the occurrence giving rise to the claim took place on or before December 31, 2001 (the "Gen Re Tail").

93.     On January 11, 2002, Seeger used mail communication to confirm with ROA management the terms of the tentative second side agreement among the RICO Defendants regarding the replacement of the 2000 Unreported Side Agreement. This letter was copied to Migel, Reindel, and William Crews.

94.     On January 24, 2002, ROA's Senior Vice President Actuarial used wire communication to inform Milliman's Pete Wick and Robert L. Sanders that a "unique loss ratio cap of 130% or greater" would be put in place.  This communication was copied to ROA management.

95.     On February 19, 2002, Sanders used wire communication to acknowledge to ROA management that he had been briefed on the effects of the Loss Portfolio Transfer, and had informed Sanders of the 2000 Unreported Side Agreement and the proposed new side agreement (the "2002 Unreported Side Agreement").   Sanders' wire communication asked ROA management for copies of the side agreements, which were provided to Sanders by facsimile transmission dated February 20, 2002.

96.     On February 27, 2002, Defendant Sanders issued his statement of Actuarial Opinion for ROA, for the year ended December 31, 2001.  At page 3, paragraph 5, Sanders represented:

> My opinion on the loss and loss adjustment expense reserves net of ceded reinsurance assumes that all ceded reinsurance is valid and collectible. The Company has represented to me that it knows of no uncollectible reinsurance cessions. I am not aware of any reinsurance that the Company treated as collectible but should have treated as uncollectible. This does not imply an opinion on the financial conditions of the Company's reinsurers. I have not anticipated any contingent liabilities that could arise if the reinsurers do not meet their obligations to the Company as reflected in the date and other information provided to me.

97.     On page 4 of the opinion, Sanders discussed various risk factors, including: "If the Company's reinsurance protection does not respond to adverse reserve deviation, such deviation could materially affect the Company's surplus."  He did not mention, however, the proposed 2002 Unreported Side Agreement or its $135 million aggregate cap, of which he had actual knowledge.  Defendant Sanders did not, in evaluating net reserves, address the impact of the proposed 2002 Unreported Side Agreement or its $135 million aggregate cap on the ceded reinsurance.

98.     Although the 2002 Unreported Side Agreement had not been finalized as of the date of the Statement of Actuarial Opinion signed by Sanders, he had knowledge of its impending implementation.  More importantly, Sanders did not mention the 2000 Unreported Side Agreement and its $140 million cap and attendant impact on reserves as of December 31, 2001.  This Agreement was in effect and was known to Sanders and Milliman.  Since the 2000 Unreported Side Agreement made material changes to existing reinsurance contracts, Sanders and Milliman should have questioned the accounting treatment of the affected reinsurance contracts.  Statement of Statutory Accounting Practices 62 ("SSAP 62," which is a statutory

implementation of Financial Accounting Standards 113 ("FAS 113")) requires that reinsurance contracts that undergo material changes be treated as deposit accounting, not the more favorable reinsurance accounting. The implementation of a cap on a contract would be such a material change.

99. Despite knowledge of the 2002 Unreported Side Agreement and its $135 million aggregate cap, Defendants Milliman and Sanders never disclosed these as a material change in the assumptions previously employed by them in providing an opinion on the adequacy of reserves of ROA or the RRGs. Nor did Milliman or Sanders ever determine, or disclose, the additional amount of reserves that would be necessary as a consequence of the 2002 Unreported Side Agreement and its $135 million aggregate cap.

100. On March 6, 2002, Migel used mail communication to send a draft of the 2002 Unreported Side Agreement to ROA management.

101. On or about April 2, 2002, ROA management and Reindel provided PwC with a list of the Agreements of Reinsurance between ROA and Gen Re, which list mentioned reinsurance agreements entered into, terminated, or commuted effective December 31, 2001, as part of the Loss Portfolio Transfer that was an integral part of the 2002 Unreported Side Agreement, but the list did not mention the 2002 Unreported Side Agreement or its $135 million aggregate cap.

102. The Loss Portfolio Transfer, which was effective as of January 1, 2002, was part of the 2002 Unreported Side Agreement. Pursuant to the Agreement, Gen Re's liability for payments made by ROA, including payments on account of RRG claims, was further limited. Payments for claims incurred, at and after 12:01 a.m., January 1, 2002, purported to be limited to an aggregate cap of $135,000,000. On March 27, 2002, ROA management executed the 2002

Unreported Side Agreement.  On April 11, 2002, Gen Re executed the 2002 Unreported Side Agreement.

103.    ROA management conspired with Gen Re with respect to the execution of the 2002 Unreported Side Agreement.

104.    The reinsurance agreements that were the subject of the 2002 Unreported Side Agreement included reinsurance agreements between ROA and Gen Re for business written by ROA, and also reinsurance agreements between ROA and Gen Re for business written by the RRGs and assumed by ROA under reinsurance agreements with the RRGs.[3]

105.    By April 30, 2002, PwC had knowledge and copies of the 2002 Unreported Side Agreement (and, therefore, of the 2000 Unreported Side Agreement) and the $135 million aggregate cap.  However, PwC's audit report and opinion on ROA's amended statutory basis financial statements for the years ended December 31, 2001, and 2000, dated September 25, 2002, did not mention or account for the 2002 Unreported Side Agreement or its $135 million aggregate cap, although it mentioned the components of the Loss Portfolio Transfer that ROA management had reported to the Commission.

106.    PwC's audit report and opinion on ROA's amended statutory basis financial statements did not opine as to whether the reinsurance accounting treatment of the contracts affected by the Loss Portfolio Transfer was proper.  As mentioned earlier, SSAP 62 requires that material changes to reinsurance agreements be accounted for under deposit accounting rules rather than the more favorable reinsurance accounting treatments.

---

[3] The listed agreements were Agreements of Reinsurance No. A238 between ROA and Gen Re, No. A273 between ROA and Gen Re (applying to business assumed by ROA from DIR under Agreement No. A 1993 between ROA and DIR), No. A289 between ROA and Gen Re (applying to business assumed by ROA from ANLIR under Agreement No. B 1993 between ROA and ANLIR), No. A442 between ROA and Gen Re (applying to business assumed by ROA from TRA under Agreement No. A 1995 between ROA and TRA), No. A456 between ROA and Gen Re, and No. A593 between ROA and Gen Re.

107.    The 2002 Unreported Side Agreement and the $135 million cap applied to claims that had occurred by December 31, 2001, and were reported as of that date, as well as to claims on policies in-force on December 31, 2001.  This was known as the Gen Re Tail coverage.  Two sets of claims are not included in this Gen Re Tail coverage: claims that occur after December 31, 2001, on policies in-force as of December 31, 2001; and new and renewal policies written on or after December 31, 2001, with claims that occurred prior to December 31, 2001, reported after that date.

108.    In July 2002, ROA and FVR entered into an agreement that provided purported reinsurance for these claims.  As part of the entire Loss Portfolio Transfer process, ROA and FVR executed Agreement of Retrocession No. 2002-1 ("Retrocession Agreement No. 2002-1"), which was effective retroactively to January 1, 2002, pursuant to which FVR reinsured ROA for new and renewal policies written or reinsured by ROA which became effective after 11:59 p.m., December 31, 2001, with respect to:

> (1) claims and losses resulting from Occurrences taking place at and after [11:59 p.m., December 31, 2001]; and

> (2) claims first made at and after [11:59 p.m., December 31, 2001] under coverage's written on a claims-made basis but only to the extent such claims are not otherwise reinsured under the terms of Agreement of Reinsurance No. A593 between ROA and General Reinsurance Corporation [(i.e., the Gen Re Tail)]

109.    Retrocession Agreement No. 2002-1 obligated ROA to pay FVR 100% of the reinsurance premium allocated to the limits reinsured thereunder, net of commission, under "ROA's reinsurance agreements A1993 with DIR, B1993 with ANLIR, and A1995 with TRA." Retrocession Agreement No. 2002-1 obligated FVR to pay ROA 100% of that portion of Net Loss sustained by ROA that were not payable by Gen Re pursuant to Gen Re's reinsurance agreements with ROA.  Retrocession Agreement No. 2002-1 would include amounts not payable

as the result of the $135 million aggregate cap, as well as claims occurring after December 31, 2001, on the then in-force policies.

110.     On a date in 2002 contemporaneous with, or subsequent to execution of, Retrocession Agreement No. 2002-1, a member of ROA management, FVR, and Wachovia executed a trust agreement, to secure the performance of FVR's obligations to ROA and the RRGs pursuant to Retrocession Agreement No. 2002-1 (the "Wachovia-FVR Trust Agreement").

111.     The initial funding of the trust created by the Wachovia-FVR Trust Agreement (the "Wachovia-FVR Trust") was made on July 11, 2002, in the amount of $6,140,578.20, which consisted of part of the Pre-2002 Trust Balance of $11 million.

112.     The Wachovia-FVR Trust was executed for the purpose of obtaining for ROA the benefit of reinsurance accounting.  A reinsurance agreement with a non-admitted, alien (i.e. Bermuda) reinsurer does not qualify for the beneficial reinsurance accounting treatment unless there is a trust fund running to the benefit of the ceding company, funds are withheld by the ceding company to cover the reinsured portion of the risk, or a letter of credit is posted by the reinsurer.  The amount of the credit against current liabilities is limited to the amount of the trust, the amount of funds withheld by the insurer, or the face value of the letter of credit.

113.     Reinsurance accounting would permit ROA to reduce certain claims liabilities for reinsurance in the form of a reduction from liability for reinsurance ceded to FVR in an amount not exceeding the maximum of (1) the liabilities carried by ROA (including liabilities for reinsurance obligations to the RRGs) and covered under the reinsurance agreement, or (2) the amount of funds held in the Wachovia-FVR Trust.

114.     The Wachovia-FVR Trust existed as security for ROA's obligations to the RRGs, which liabilities passed to FVR under Retrocession Agreement No. 2002-1.

115.    Any credit for reinsurance obtained by ROA under Virginia law enables ROA to maintain sufficient surplus to continue to be an admitted reinsurer with respect to the RRGs under Tennessee law.

116.    The Wachovia-FVR Trust was always capitalized inadequately to fund FVR's disclosed and undisclosed obligations to ROA, and ROA management, Sanders, Milliman, PwC, Stephani, Gen Re, and Wachovia had knowledge that the Wachovia-FVR Trust was inadequately capitalized.

117.    At the time the 2002 Unreported Side Agreement was executed, the RICO Defendants knew, or should have known, that ROA's Net Loss and Adjustment Expense under all Subject Reinsurance Agreements would far exceed the $135 million aggregate cap on Gen Re's liability as ROA's reinsurer.

118.    No later than June of 2002, Defendant Milliman had knowledge that the aggregate liabilities under the publicly disclosed ROA-Gen Re reinsurance treaties exceeded the $135 million aggregate cap on Gen Re's liability established by the 2002 Unreported Side Agreement.

119.    ROA's Net Loss and Adjustment Expenses under the business subject to the Loss Portfolio Transfer between Gen Re and FVR alone was already anticipated in March 2002 to be on the order of at least $165 million.  Therefore, even without considering the other Subject Reinsurance Agreements, ROA's reported insurance recoverable from Gen Re would likely be impaired by at least $30 million, and ROA's March 2002 Quarterly Statement overstated ROA's surplus to policyholders by at least $30 million.

120.    If the full impact of the Loss Portfolio Transfer had been recognized by ROA in its quarterly financial statements filed with the SCC, the resulting decrease in policyholder surplus would have indicated that the SCC act sooner to take regulatory action regarding ROA.

Therefore, this overstatement of credit for reinsurance and the concomitant overstatement of ROA policyholder surplus translated into overstatements on the RRGs' March, June, and September 2002 Quarterly Statements filed with the TDCI and signed by and attested to by certain members of ROA management.

121.    Under Virginia law, the SCC's prior written approval of the 2002 Unreported Side Agreement was required if, as of the date the 2002 Unreported Side Agreement was executed, the resulting change in ROA's liabilities was anticipated to equal or exceed 50% of ROA's surplus to policyholders as of the immediately preceding December 31.

122.    Disclosure of the 2002 Unreported Side Agreement to the TDCI would have prompted immediate regulatory investigation, and Plaintiffs would not have contributed to the Capital Call.

123.    As of December 31, 2001, as reported in ROA's 2001 Annual Statement, signed February 27, 2002, 50% of ROA's reported surplus to policyholders equaled $41,118,168.50. However, as discussed above, ROA's reported surplus to policyholders as of December 31, 2001, was inflated by at least $22.9 million (as a result of $2.5 million in false assets and $20.4 million of arbitrary reserves write-downs).  Fifty percent of ROA's reported surplus to policyholders as of December 31, 2001, did not exceed $30 million (*i.e.,* $41.1 million less 50% of the $22.9 million surplus to policyholders inflation).  In fact, as reported in ROA's Amended 2001 Annual Statement, signed September 6, 2002 (after the Virginia SCC required ROA to re-file its annual statement due to irregularities), 50% of ROA's reported surplus to policyholders as of December 31, 2001, equaled $18,789,402.50.

124.    ROA management knew, or should have known, as of the date on which the 2002 Unreported Side Agreement was executed, that the change in ROA's liabilities anticipated to

result from the 2002 Unreported Side Agreement exceeded 50% of ROA's surplus to policyholders as of the immediately preceding December 31.

125.    There is additional evidence that the RICO Defendants anticipated that the change in ROA's liabilities anticipated to result from the 2002 Unreported Side Agreement would exceed 50% of ROA's surplus to policyholders as of the immediately preceding December 31.

126.    The 2002 Unreported Side Agreement was entered into without the prior written consent of the SCC or TDCI.  Neither ROA management, Milliman, Sanders, Stephani nor PwC reported the 2002 Unreported Side Agreement to the SCC, the TDCI, Plaintiffs or subscribers/putative class members.

127.    In ROA's Annual Statement for the Year 2001, which was filed with the SCC on or about March of 2002, ROA management (with the knowledge and complicity of Gen Re, Milliman and Sanders) answered falsely under oath "No" to the following general interrogatories on February 27, 2002:

> 6.1 Has this reporting entity reinsured any risk with any other entity under a quota share reinsurance contract which includes a provision which would limit the reinsurer's losses below the stated quota share percentage (e.g., a deductible, a loss ratio corridor, a loss ratio cap, an aggregate limit or any similar provision)?

> 7.1 Has this reporting entity reinsured any risk with any other entity and agreed to release such entity from liability, in whole or in part, from any loss that may occur on the risk, or portion thereof, reinsured?

128.    Also, on the first page of ROA's 2001 Annual Statement, ROA management (with the knowledge and complicity of Gen Re, Milliman and Sanders) represented falsely under oath that:

> . . . this annual statement, together with related exhibits, schedules and explanations therein contained, annexed or referred to are a full and true statement of all the assets and liabilities and of the

condition and affairs of the said insurer as of the thirty-first day of December, 2001, and of its income and deductions therefrom for the year ended on that date, which ultimately led to injury to the Plaintiffs and other subscribers/putative class members, and have been completed in accordance with the NAIC annual statement instructions and accounting practices and procedures manuals except to the extent that: (1) state law may differ; or (2) the state rules or regulations require differences in reporting not related to accounting practices and procedures, according to the best of their information, knowledge and belief, respectively.

129.    These false statements were material, were intended to deceive, and were violations by ROA management of 18 U.S.C. §§ 1033(a) and 1033(c), which ultimately led to injury to the Plaintiffs and other subscribers/putative class members.

130.    Neither ROA nor any of the RRGs received any consideration for entering into the 2002 Unreported Side Agreement.

## VI.  MISAPPROPRIATION AND/OR CONVERSION OF TRUST FUNDS

131.    As referenced above, in conjunction with the Loss Portfolio Transfer, an FVR trust fund was to be established that would be dedicated to addressing claims of policyholders.

132.    The initial source of funding of the trust was to be an approximate $11 million that came from liquidating previously existing FVR trusts, but that was kept by Gen Re as part of the Loss Portfolio Transfer transaction.

133.    The approximately $11 million initial deposit did not occur.   Rather, approximately $6 million was placed in the FVR trust that was dedicated to addressing claims of policyholders.

134.    Premium dollars paid by the insureds were deposited into the FVR Trust, which was held at Wachovia Bank.

135.    Numerous actions by ROA management caused millions of dollars to be withdrawn from the FVR Trust for purposes that were not for the payment of claims of insureds.

136.    For instance, in or around September 2002, ROA management orchestrated, directed, or were involved in the wrongful transfer of approximately $1.2 million from the FVR Trust for use in paying Wachovia on a debt owed by ROA/TRG to Wachovia.

137.    Also in September 2002, ROA management orchestrated, directed, or were involved in the transfer of $3 million from a DIR letter of credit to another FVR account, which then was used to pay Wachovia amounts owed to it by ROA/TRG.

138.    These transfers, and others that further investigation will reveal, were made with the knowledge and/or active assistance and/or negligent acquiescence of ROA management and/or Wachovia.

139.    In addition, ROA management withdrew or orchestrated the withdrawal of FVR Trust funds for purposes other than those for which the trust was created, including payment of personal expenses and the expenses or debt of entities other than the RRGs.

## VII.  CAPITAL CALL CONTRIBUTIONS

140.    In or around June of 2002, ROA requested all professional liability subscribers, including the Kentucky, Mississippi and Alabama Plaintiffs and the putative class, to make a capital call contribution to their equity accounts prior to June 30, 2002.  All subscribers were informed that in the event they chose not to participate in the capital contribution, their respective facilities would no longer be eligible for professional liability, or any other ROA products such as worker's compensation, general and umbrella policies upon their next renewal date.  ROA targeted $72 million in contributed capital.

141.    In anticipation of the Capital Call, in the Spring of 2002, the Defendants sent out numerous information packets via the wires and U.S. Mail and conducted meetings throughout the United States, including separate meetings in Montgomery, Alabama, Louisville, Kentucky

and Jackson, Mississippi, in which the Defendants misrepresented and suppressed/failed to disclose material facts regarding the Capital Call which was made to Plaintiffs and other subscribers/putative class members.  Such misrepresentations and suppression/failure to disclose material facts specifically related to the purported financial and actuarial solvency of the Defendants, the reasons for the Capital Call, the fact that Defendant General Reinsurance would bolster ROA's solvency, and the fact that Defendant Gen Re would cover all claims not covered by ROA and/or its affiliates.  The Defendants convinced all capital contributors, including the Plaintiffs and the putative class, that their respective contributions would solidify the various insurance entities and thereby make them financially strong.

142.   In particular, meetings took place across the Southeast in which ROA management, agents and/or employees of ROA and agents and/or employees of General Reinsurance made material false representations of fact regarding the Capital Call.  In this instance, representatives of Plaintiffs St. Joseph – Mount Sterling d/b/a Mary Chiles Hospital f/k/a Gateway Regional Health System, Inc. d/b/a Mary Chiles Hospital, T.J. Samson Community Hospital, Hardin Memorial Hospital, Green River Regional Mental Health/Mental Retardation Board, Inc. d/b/a River Valley Behavioral Health Hospital, Harrison Memorial Hospital, James B. Haggin Memorial Hospital, Owensboro Medical Health System, Twin Lakes Regional Medical Center, Highland Regional Medical Center, Murray-Calloway County Hospital, Caverna Memorial Hospital, Inc., Clinton County Hospital, Inc., Jane Todd Crawford Memorial Hospital, Livingston Hospital and Healthcare Services and Pattie A. Clay Regional Medical Center, among other unnamed policyholders, met with the aforesaid representatives in Louisville, Kentucky, at the Holiday Inn in June of 2002.  Furthermore, representatives of Plaintiff Crenshaw Community Hospital, and Bullock County Hospital attended a similar

meeting in Montgomery, Alabama, in June of 2002. Likewise, representatives of Plaintiffs, Delta Regional Medical Center, South Sunflower County Hospital, Covington County Hospital, Forrest General Hospital, George County Hospital, Grenada Lake Medical Center, H.C. Watkins Memorial Hospital, Inc., Hancock Medical Center, Jeff Anderson Regional Medical Center, King's Daughters Hospital of Brookhaven, King's Daughters Hospital of Yazoo City, Mississippi Baptist Health System, Montfort Jones Memorial Hospital, Neshoba County General Hospital, Noxubee General Hospital, Oktibbeha County Hospital, South Central Regional Medical Center, Tippah County Hospital, Walthall County General Hospital, Wayne General Hospital, Winston Medical Center, Yalobusha General Hospital, attended several similar meetings which took place in Jackson, Mississippi throughout the Spring of 2002.

143.   In addition to the other misrepresentations and suppression/failure to disclose material facts set out herein, Defendants specifically represented on several occasions to the Plaintiffs and other hospitals that the Defendants were financially and actuarially strong and that the Capital Call was necessary for legitimate business purposes. Defendants further suppressed/failed to disclose material facts that the Defendants were not financially and actuarially strong, that the Capital Call was not for legitimate business purposes, that Defendants made improper accounting and actuarial entries to make Defendants appear financial strong, and that Defendant General Reinsurance would bolster ROA's solvency. The Defendants, including Defendant Gen Re and its agents, Defendant Milliman and its agents, told representatives on several occasions that Gen Re would pay any claims that ROA could not pay, i.e., that Gen Re would "step in the shoes" of ROA if needed. Defendants further misrepresented and failed to disclose other material facts set out herein.

144.    In reliance on these misrepresentations and failures to disclose, the subscribers referenced herein along with the putative class paid, and ROA collected, approximately $53.5 million from the subscribers/putative class as a result of the Capital Call.   The capital contributions were part of the equity accounts of the subscribers in the putative class.   The capital contributions from the Capital Call became equity in ROA under the terms of the subscription for putative class members.

## VIII.  THE DEFENDANTS VIOLATED AND CONSPIRED TO VIOLATE 18 U.S.C. §1962(c) THROUGH A PATTERN OF RACKETEERING ACTIVITY, RESULTING IN INJURY TO EACH OF THE PLAINTIFFS

145.    Beginning at least as early as 1991, or shortly after Gen Re began acting as a pass-through intermediate reinsurer between the ROA and FVR, ROA management, together with Gen Re, Seeger, Kellogg, Reindel, Migel, Milliman, and Sanders conducted or participated (directly or indirectly) in the conduct of the affairs of an association-in-fact enterprise (the "Association-in-Fact Enterprise") through a pattern of racketeering activity, or conspired to do so.

146.    The Association-in-Fact Enterprise had an identifiable organizational structure. In essence, the Association-in-Fact Enterprise consisted of an informal "de facto" partnership among the RICO Defendants.  Although all of the RICO Defendants participated in decision-making for the Association-in-Fact Enterprise, Kellogg was among the most influential, and others looked to him for leadership.

147.    The Association-in-Fact Enterprise had ongoing mechanisms for directing its affairs on an ongoing basis.  The Association-in-Fact Enterprise made regular use of wire, facsimile, email and mail communications among its participants for directing its affairs.  In addition, the RICO Defendants convened for summer meetings on a regularly scheduled basis.

148.     The Association-in-Fact Enterprise was engaged in interstate commerce.

149.     Alternatively, beginning at least as early as 1991, the RICO Defendants conducted, or participated (directly or indirectly) in the conduct of, the affairs of ROA and TRG (the "Reciprocal RICO Enterprise") through a pattern of racketeering activity, or conspired to do so.

150.     The Reciprocal RICO Enterprise was engaged in interstate commerce.

151.     Specifically, the pattern of racketeering activity consisted of the use of fraudulent schemes, including multiple instances of mail fraud and wire fraud, involving certain undisclosed insurance rebates and aggregate "caps" on reinsurance (at least some of which required the prior written approval of regulators), sham reinsurance agreements involving no substantial transfer of risk, arbitrary reserve write-downs, fraudulent financial transactions and reports, and fraudulent abuse of a regulated trust fund, fraudulent use of the mail and wire to arrange and attend numerous meetings as well as to provide information regarding the Capital Call more specifically described herein, among other fraudulent practices.

152.     The RICO Defendants shared the purposes of, *inter alia,* including Plaintiffs and subscribers/putative class members into participating in the Capital Call as described herein, avoiding and minimizing regulatory scrutiny, concealing the true financial condition of ROA, concealing the financial difficulties of ROA that eventually developed and of which the RICO Defendants became aware, concealing the inadequacy of  the surplus to policyholders of ROA, and, ultimately, concealing the insolvency of ROA, all in order that the RICO Defendants might maximize benefits resulting from the interstate commerce engaged in, by, and among ROA, Gen Re, and Milliman.  Depending upon the RICO Defendants, such benefits took the form of salaries, bonuses, perquisites, or contractual remuneration, or favor curried with management of

the employers of some of the RICO Defendants due to their roles in maximizing profits for their respective employers. The criminal acts engaged in by the RICO Defendants were committed in furtherance of their common purposes.

153. The criminal acts of the RICO Defendants were continuous over a substantial period of time starting as early as 1991 and were open-ended, in that those criminal acts would have extended into the future had they not been detected by the regulators, who put an end to the racketeering activity by placing ROA and the RRGs in receivership. At the very least, these criminal acts extended through 2003. In addition, the RICO Defendants' criminal acts posed a special threat to society. The RICO Defendants' criminal acts had multiple similar victims, which included all participants in the Capital Call.

154. The RICO Defendants' criminal acts had the actual result of misrepresenting and concealing the true financial condition of ROA, thereby postponing the initiation of delinquency proceedings and enabling the RICO Defendants to prolong their receipt of salaries, perquisites, or contractual remuneration, or to curry favor with management at the RICO Defendants' respective employers. During this time, ROA amassed increased liabilities, so that by the time the companies were placed in receivership, each was deeply and hopelessly insolvent.

155. The criminal acts described herein had the same or similar participants, in that all of the RICO Defendants were involved in the pattern of racketeering activity, even if each and every RICO Defendant did not play a direct role in each and every criminal act and fraudulent scheme.

156. Contractual remuneration received by Defendant Gen Re included millions of dollars in profits and fees on reinsurance agreements with ROA, including agreements for the

pass-through of ROA's reinsurance of the RRGs, and such remuneration was extended because of the Capital Call as described herein.

157.    Remuneration received by Defendant Milliman from ROA and the RRG's was in excess of $1 million over a period of five years.

## IX.  WRONGFUL CONDUCT OF MILLIMAN AND ROBERT SANDERS

158.    In addition to the allegations set forth, *supra*, Plaintiffs/putative class allege the following:  Defendant Milliman's connection with ROA began in 1997, when Robert Sanders became the appointed actuary for TRA.  In 1998, Sanders became the appointed actuary for ROA, DIR, ANLIR and FVR.  From 1998 to 2001, Sanders and Milliman:  (1) performed rate, claim, and profitability studies for ROA and the RRGs; (2) performed strategic planning and financial projections for ROA and the RRGs; (3) performed risk based capital analysis for ROA and the RRGs; (4) performed A.M. Best analysis and guidance to ROA; (5) assisted in regulatory filings for ROA and the RRGs and (6) provided due diligence for all parties in the Alabama Hospital merger with ROA.

159.    Throughout their tenure as the appointed actuaries for ROA and the RRGs, Sanders and Milliman engaged in active concealment and material misrepresentations as well as a conspiracy with the Defendants and the other RICO Defendants to cover-up the true financial condition of ROA to insurance regulators, insurance rating companies and the Plaintiffs/putative class..  First, Milliman and Sanders failed to disclose the "pass through" arrangement with Gen Re.  Notably, Milliman disclosed that Gen Re provided retrocessional protection to ROA, but did not disclose that the pass through business was then retroceded to FVR.

160.    Milliman and Sanders also failed to disclose the caps on ROA's ceded liability to Gen Re.  The 2000 Secret Side Agreement entered into between ROA and Gen Re was dated

November 16, 2000.  The actuarial statement prepared by Sanders for year end 2001 reserves was issued on February 27, 2002.  Although Sanders received a copy of the 2000 Secret Side Agreement on February 20, 2002, he allowed his report for 2001 to be provided to regulators, which constitutes a material misrepresentation.  Sanders and Milliman knew that ROA management had intentionally withheld information about the 2000 Secret Side Agreement from regulators and failed to disclose this fact.  Milliman and Sanders also knew of the 2002 Unreported Side Agreement and its $135 million aggregate cap, but never disclosed these as a material change in the assumptions previously employed by them in providing an opinion on the adequacy of reserves of ROA or the RRGs.

161.    Moreover, before the issuance of the 2001 report, Milliman and Sanders were aware of the details of negotiations between Gen Re and ROA related to the Loss Portfolio Transfer ("LPT") and the execution of the LPT itself.  Despite knowledge of this LPT agreement, Milliman and Sanders provided a "clean" actuarial statement of opinion on reserves as of December 31, 2001, which is a material misrepresentation that ROA was adequately reserved and financially solvent..  Significantly, the LPT was drawn up as a 2001 event for FVR and a 2002 event for ROA.  As appointed actuary for ROA and FVR, Milliman and Sanders also failed to disclose that FVR was a captive company under common control with ROA and in a hazardous condition with a trust balance insufficient to support its liabilities.

162.    Milliman and Sanders also failed to disclose to the ROA Board, which was composed of the Plaintiff/subscriber hospitals, the problems associated with DIR and its financial impact on ROA.  Milliman and Sanders made several important observations and conclusions that concerned them, but these observations were never revealed to the ROA Board.  For example, Milliman and Sanders performed a claim study that found that DIR's practices with

respect to setting initial claim reserves, claim settlement practices and changes in litigation practices were troubling. Although these concerns existed, the study was not disclosed in reserve reports. As a result, the loss and Allocated Loss Adjustment Expense (ALAE) projections in the reserve reports were distorted, which was a material misrepresentation that ALAE was in a better condition than it actually was. Additionally, Milliman and Sanders knew that Vince Franz, a DIR employee, was pressured by ROA management every year after 1999 to push DIR's reserves to the bare minimum or even below the accepted minimum.

163. Milliman and Sanders also failed to disclose the fact that the FVR Trust was consistently underfunded. To avoid a Schedule F surplus penalty, Gen Re was required by law (and FVR by contract) to securitize its risk by requiring that FVR maintain 102% of its loss reserves in its trust for Gen Re's benefit. However, between 1998 and 2001, the FVR trust remained underfunded virtually every quarter except December. Despite a duty to do so, Milliman and Sanders conducted no due diligence with respect to the FVR Trust. And despite knowing about it, Milliman and Sanders failed to report the FVR Trust underfunding issue in its role as appointed actuary for ROA, DIR, ANLIR, TRA and FVR and, in fact, consistently reported that the FVR Trust was adequately funded throughout the course of its professional relationship with ROA.

164. Milliman and Sanders also performed a DIR profitability study in 2000-2001 that found that DIR was extremely unprofitable. While Milliman and Sanders found that there had been tremendous rate cuts from 1995 to 2000 and that staggering loss ratios developed for DIR due to insufficient premiums, this information and its impact on ROA was never disclosed to the ROA Board or the Plaintiffs/subscriber hospitals. In fact, Milliman and Sanders routinely

reported that DIR's condition was profitable to the ROA Board and the Plaintiffs/subscriber hospitals.

165.     Moreover, Milliman and Sanders failed to perform a number of tasks that would have uncovered the problems at ROA.   Milliman and Sanders relied solely upon ROA management for details involving transactions with FVR and Gen Re.   Despite being the appointed actuary for ROA and FVR, it is apparent that Milliman and Sanders failed to review any of the contracts at FVR.   The simple fact that FVR was ceding risk back to Gen Re in $2M and $6M amounts was suspicious.   Milliman and Sanders also failed to act upon Risk Based Capital calculations that he received from Crissy Brooks showing that two of the RRGs had failed the 200% benchmark for triggering regulatory action.

166.     Finally, on several occasions in 2001 and 2002, Sanders made direct misrepresentations to ROA Subscribers.   For example, in the presentation leading up to the capital call in June, 2002, Mr. Sanders told the ROA Board that if the capital call contribution was made, then ROA's Risk Based Capital would exceed 400% and that the company would be financially sound.   Mr. Sanders also told ROA Board members at a later meeting that any cap associated with the Loss Portfolio Transfer would not be exceeded, when in fact, it was exceeded at its inception.   Mr. Sanders further represented on numerous occasions that the equity of the Hospital Policyholder Class would not be eroded by DIR losses, when this was untrue.   Despite having knowledge that these statements were false, Milliman and Sanders made these misrepresentations to members of the Hospital Policyholder Class.   Had Milliman and Sanders been truthful with the Hospital Policyholder Class, then the Hospital Policyholder Class would not have contributed approximately $41M to the capital contribution campaign and would have sought to preserve their existing equity in ROA.

## X.  WRONGFUL CONDUCT OF PRICEWATERHOUSECOOPERS AND GARY STEPHANI

167.    In addition to the allegations set forth herein, *supra*, Plaintiffs/putative class allege the following: PwC and Stephani were retained by ROA, DIR, ANLIR and TRA to perform the independently prepared annual audits of ROA's 1999-2001 statutory basis financial statements required by Virginia law.  PwC was also retained by ROA to perform annual audits for FVR but was later fired by ROA and did not perform the 2001 audit of FVR.  In each of the financial statements, PwC utilized its own actuaries to review and either accept or re-perform the actuarial work and reserve reports done by Milliman for ROA, DIR, ANLIR and TRA.  The PwC audit team was also charged with performing corroborative tests to determine the adequacy and propriety of the loss and allocated loss adjustment expense (ALAE).

168.    PwC and its agents and employees, including Stephani, maintained deficient accounting procedures, failed to properly investigate matters and committed associated SSAP violations.  First, PwC and Stephani failed to obtain sufficient competent information regarding the relationships of the parties, the substance of the transactions and the ultimate effects of the various transactions on ROA's financial statements.  For example, PwC and Stephani failed to investigate and allowed as an asset the unusual prepayment of $10M in premiums by ROA directly to FVR on December 28, 2000.  This $10M payment was documented by ROA as a prepaid premium to FVR but was in actuality a surplus support to cover FVR/DIR losses.  ROA claimed the $10M as an admitted asset.  With respect to this transaction, PwC sent a Confirmation Request to Gen Re, but Gen Re refused to sign the Confirmation Request.  PwC and Stephani further failed to investigate Gen Re's failure to sign the Confirmation Request and did not even attempt to send a second Confirmation Request.  While PwC expressed concerns

over the premium deficiency at a May, 2001 FVR meeting, PwC took ROA's word that it would be fixed and did not investigate the matter further.

169.    PwC and Stephani failed to disclose that ROA and FVR had provided surplus to DIR, ANLIR and TRA.  The existence, nature and purpose of the Surplus Support Agreements were never disclosed in ROA's 1999-2001 statutory basis audited financial statements or considered in ROA's calculation of Risk Based Capital.  These Surplus Support Agreements should have been disclosed, because they placed significant liabilities on ROA and affected ROA's A.M. Best ratings.  PwC and Stephani failed to disclose that the Surplus Support Agreements between ROA and the RRGs were in perpetual default.

170.    PwC and Stephani also failed to ensure disclosure of the affiliated nature of ROA, DIR, ANLIR, TRA and FVR.  PwC and Stephani did not combine the financial statements of the affiliated companies as required by the NAIC's Property and Casualty Annual Statement Instructions.  PwC and Stephani further failed to identify related-party transactions.  For example, PwC and Stephani failed to determine if the related party reinsurance transactions between ROA, DIR, ANLIR, TRA and FVR complied with the Virginia Administrative Code and failed to investigate these related-party transactions with heightened scrutiny as required by generally accepted auditing standards.

171.    Moreover, PwC and Stephani failed to perform any substantive risk transfer analysis required by SSAP No. 62.  In the 1999 Statutory-Basis Financial Statements of ROA, the use of traditional reinsurance accounting under SSAP 62 was misleading.  Because not all of ROA's reinsurance agreements transferred risk, deposit accounting under SSAP 75 was the proper accounting procedure that should have been used.  Although PwC acknowledged concerns about the reinsurance arrangement with Gen Re, PwC and Stephani never followed

through with any investigation.  There are no actual reinsurance balances confirmed with Gen Re in PwC's audits of ROA in 2000 and 2001.  PwC and Stpehani failed to obtain and examine reinsurance ceded agreements and failed to disclose the amount of reserves ceded to FVR.  PwC and Stephani assumed that there were no issues of viability, because Gen Re was the reinsurer of ROA.  However, PwC and Stephani failed to analyze FVR, the captive company that Gen Re was retroceding ROA's liabilities to, in order to determine FVR's viability (again, PwC served as the appointed auditor for FVR in 1999 and 2000).  Furthermore, PwC and Stephani failed to disclose the consistent under-funding of the FVR Bermuda Trust, thereby causing FVR to be in default of its obligation to Gen Re.

172.    By April 30, 2002, PwC and Stephani had knowledge and copies of the 2002 Unreported Side Agreement (and, therefore, of the 2000 Unreported Side Agreement) and the $135 million aggregate cap.  However, PwC's audit report and opinion on ROA's amended statutory basis financial statements for the years ended December 31, 2001, and 2000, dated September 25, 2002, did not mention or account for the 2002 Unreported Side Agreement or its $135 million aggregate cap, although it mentioned the components of the Loss Portfolio Transfer that ROA management had reported to the Commission.  PwC's audit report and opinion on ROA's amended statutory basis financial statements did not opine as to whether the reinsurance accounting treatment of the contracts affected by the Loss Portfolio Transfer was proper.  As mentioned earlier, SSAP 62 requires that material changes to reinsurance agreements be accounted for under deposit accounting rules rather than the more favorable reinsurance accounting treatments.

173.    PwC and Stephani also failed to document loss reserves and case reserve write downs.  PwC failed to detect the extremely late adjusting entries used to "correct" sub-200%

Risk Based Capital problems.  Moreover, there is no evidence that PwC and Stephani tested Milliman's estimated loss reserves or ROA's case reserves for accuracy or adequacy.

174.   Finally, and importantly, PwC and Stephani failed to present qualified and/or adverse opinions.  For example, PwC and its agents or employees observed the following errors in a May 23, 2002 Presentation and should have required ROA to eliminate or correct the following material errors:  (1) doing business with affiliates or related parties under terms that were not fair and reasonable; (2) reporting certain reinsurance transactions using the traditional reinsurance accounting mode when those reinsurance treaties may not have met the required risk transfer criteria; (3) failing to properly record loss and loss adjustment expense reserves; (4) materially mis-stating its financial condition and materially overstating its capital and surplus position; and (5) filing false and misleading Annual Statements and audited financial statements with the State of Virginia.

175.   Immediately upon ROA's failure or refusal to correct such errors, PwC and Stephani should have issued a qualified or adverse opinion.  Within five days of a determination that an insurance company has materially misstated its financial condition as reported to the Commissioner of Insurance, an adverse opinion is required to notify an insurance company's board of directors of such error.  As previously stated, ROA's board of directors was comprised of subscriber hospitals.  If an adverse opinion had been issued by PwC and Stephani, the Hospital Policyholder Class would not have made their capital call contributions in June, 2002 and would have attempted to preserve their equity.

## XI.  DAMAGES RESULTING FROM THE SCHEMES

176.   As a result of the schemes devised and implemented by the Defendants and others, the Plaintiffs and other subscribers/putative class members were damaged by the

misappropriation of funds, by the misrepresentations and suppression/failure to disclose to regulators, and by the Defendants' violations of the RICO statute, Plaintiffs and subscribers/putative class members which allowed the companies to continue to operate and incur ever increasing liabilities.

177.   ROA management had a statutory duty to comply with the insurance laws establishing minimum surplus to policyholders in order to ensure the financial viability of ROA and their ability to pay insurance claims.

178.   The Plaintiffs and subscribers/putative class members relied on Defendant PwC's unqualified audit opinions, Defendant Milliman's actuarial opinions, the alleged completeness of the contracts of reinsurance between the RRGs and ROA, and between ROA and Gen Re, the RRGs' financial statements prepared by ROA management, representations by Gen Re, Milliman and Sanders, PwC, Stephani and the RRGs' RBC reports, in deciding to contribute to the Capital Call and to accept that the RRGs' financial statements fairly presented their financial position and that the RRGs maintained not less than the minimum required surplus to policyholders.

179.   Because the financial statements of ROA showed the company to be solvent, and because each company's RBC report indicated that the company maintained not less than the minimum required surplus to policyholders, ROA continued, and the Virginia SSC allowed it to continue, issuing new policies, taking on new debts and setting up the Capital Call.

180.   The financial statements and RBC reports of ROA materially misrepresented its true financial condition and surplus to the Plaintiffs and subscribers/putative class members.

181.   ROA's surplus to policyholders was inflated by the schemes detailed in this Complaint, by at least $5,441,500  as of September 30, 2000 (as a result of the arbitrary write-

down of reserves); by at least $19,275,993 as of December 31, 2000 (as a result of the $10 million "pre-paid premiums," $3.5 million in false "assets," and the arbitrary write-down of reserves by $5,775,993); by at least  $32.8 million as of September 30, 2001 (as a result of the $25.8 million arbitrary reserves write- down and $7 million in false "assets"); by at least $22.9 million as of December 31, 2001 (as a result of $2.5 million in false "assets" and $20.4 million in arbitrary reserves write-downs), not to mention the as-yet undetermined effect of the 2000 Unreported Side Agreement; by at least $30 million as of March 31, 2002 (as a result of the 2002 Unreported Side Agreement); and by at least $42.5 million as of September 30, 2002 (as a result of the 2002 Unreported Side Agreement and Reinsurance Agreement No. 9016).

182.    As a result of the inflated surplus to policyholders reported by ROA, ROA was able to continue as a purported authorized reinsurer for the RRGs.  This deflected regulatory scrutiny by the VA SCC, which ultimately led to injury to the Plaintiffs and subscribers/putative class members.

183.    PwC opined in its September 25, 2002, report to the Board of Directors of ROA, that ROA's 2001 statutory basis financial statements were materially misstated and that, adjusted for the misstatements, ROA's surplus to policyholders was only $37,578,807, which was below the RBC calculated Authorized Control Level.  This triggered additional regulatory corrective action by the Virginia SCC.  But even this low surplus to policyholders did not factor in the effect of the 2002 Unreported Side Agreement, with its $135 million aggregate cap.  Note 3 to ROA's amended 2001 statutory basis financial statements made the following representation:

> At December 31, 2001, [ROA] had unsecured reinsurance
> recoverables of $337,166,000 from [Gen Re]. [Gen Re] is rated
> A++ Superior by A. M. Best Company, an insurance rating
> service.

In note 13 ("Subsequent Events") to ROA's amended 2001 statutory basis financial statements, only certain of the related transactions comprising the Loss Portfolio Transfer were reported. Remarkably, note 13 made no mention of the 2002 Unreported Side Agreement or its $135 million aggregate cap. This omission was materially misleading and made either negligently, wantonly or fraudulently.

184.     In late December of 2002, after having learned of the 2002 Unreported Side Agreement with its $135 million aggregate cap, and other financial irregularities, the SCC made a preliminary estimate of ROA's surplus to policyholders and RBC.  ROA's Statement of Operations for the Month Ended October 31, 2002, reported ROA's surplus to policyholders to be $46,742,461.  However, after adjusting for sham Reinsurance Agreement No. 9016, a $5 million deficit in the Wachovia-FVR Trust, an estimated $50 million in liabilities in excess of the $135 million aggregate cap, and other irregularities, the SCC estimated ROA's surplus to policyholders to be only $3,664,982, or 10% of ACL. This was a Mandatory Regulatory Control Event.

185.     When the SCC discovered that ROA was in a hazardous financial condition in late December of 2002, ROA was allowed an opportunity to raise additional capital.  When that effort failed, the SCC made preparations to place ROA in receivership.  With ROA in receivership, it became clear that payment by ROA of the obligations owed to the RRGs was impaired, and Commissioner Flowers placed the RRGs into receivership.

186.     If Defendant PwC's audit reports, Defendant Milliman's actuarial opinions, the financial statements of ROA, Gen Re and the RRGs, the RBC reports of ROA and the RRGs had been complete and accurate, ROA could have been prohibited much sooner from incurring additional liabilities that they are now unable to satisfy and from initiating the Capital Call.

187.    As a proximate result of a pattern of racketeering activity, consisting of the use of fraudulent schemes, multiple instances of mail fraud and wire fraud, undisclosed insurance rebates and aggregate "caps" on reinsurance (at least some of which required the prior written approval of regulators, from whom the caps were concealed by Defendants, including Milliman among others), sham reinsurance agreements involving no substantial transfer of insurance risk, arbitrary reserve write-downs, conducting of the Capital Call and fraudulent financial transactions and reports, the RICO Defendants were able to avoid or minimize regulatory scrutiny, conceal the true financial condition of ROA, conceal the financial difficulties of ROA that eventually developed and of which it became aware, and conceal the inadequacy of surplus to policyholders.   This pattern of racketeering activity enabled the RICO Defendants to maximize benefits to themselves from the interstate commerce engaged in by and among ROA, Gen Re, and FVR.  Meanwhile, however, this pattern of racketeering activity proximately caused ROA to incur additional liabilities which it is now unable to pay in full, resulting in injury to the Plaintiffs, and subscribers/putative class members.

188.    The Plaintiffs and the putative class were also damaged in that they continued to rely on ROA to provide them with viable insurance and by contributing to the Capital Call.

189.    As a result of the direct actions of the Defendants, the Plaintiffs and the putative class suffered damages, which include but are not limited to:

a.    Recovery of any and all Capital Call contributions made by the Plaintiffs and/or subscribers/putative class members when ROA received $53.5 million from capital contributions of subscribers such as the Plaintiffs in a purported effort to restore the RBC ("risk based capital") ratio to safe levels.   In particular, the Plaintiffs and/or subscribers/putative class members received financial and

actuarial information from ROA/TRG in an effort for ROA/TRG to receive Capital Call contributions. Collectively the Plaintiffs and the putative class members contributed over $41 million dollars to ROA as a result of the Capital Call;

b. Expenses and damages resulting from the loss of tail coverage and purchase of additional tail coverage;

c. Expenses and damages or additional administrative time devoted to ROA's insolvency;

d. Any and all damages or expenses incurred by the Plaintiffs and/or subscribers/putative class members that relate to obtaining replacement professional liability coverage, general liability coverage, umbrella coverage, worker's compensation insurance coverage and/or other replacement coverage. Such damages include, but are not limited to, infusing capital into new self-insured groups which were formed to provide insurance coverage for the Plaintiffs and/or forming captive insurance companies;

e. Attorney fees paid or incurred by the Plaintiffs and/or subscribers/putative class members as a result of no longer having insurance coverage through ROA/TRG and its related entities. Such damages include attorneys fees paid to pursue claims in the ROA/TRG insolvency proceeding, the RRG's insolvency proceeding, as well as to defend claims that should have been covered by their insurance;

f. Any and all damages or expenses incurred by the Plaintiffs subscribers/putative class members related to an increase in fees and/or premiums for replacement

professional liability coverage, general liability, umbrella coverage, worker's compensation coverage and/or other replacement coverage;

g.  Attorney fees paid or incurred by the Plaintiffs and subscribers/putative class members as a result of the receivership of ROA/TRG and the RRGs. This includes attorneys fees paid to pursue claims in such insolvency proceeding;

h.  Expenses and damages incurred as a result of settling cases that ordinarily would have been successfully defended, which had the effect of increasing the Plaintiffs future liability premiums;

i.  The payment of premiums for the insurance at issue, to include continuing to pay premiums to ROA and its related entities for continued or renewal coverage; and

j.  And any and all other damages flowing from Defendants' wrongful conduct, which have not been excluded herein, including lost equity once held by the subscribers/putative class members in their ROA equity accounts.

## COUNT I

## VIOLATION OF 18 U.S.C. § 1961 et seq. and § 1962(c) "RICO"

190.  Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if set out here in full.  To the extent necessary, this cause of action is pled in the alternative to COUNT II, *infra*.

191.  The RICO Defendants' conduct as set out herein constitutes a violation of 18 U.S.C. § 1962(c).  The RICO Defendants have acted together, along with individuals and entities whose identities are currently unknown to Plaintiff, to conduct an enterprise through a pattern of racketeering activity.  As discussed in detail herein, Defendants have intentionally participated in a scheme to defraud Plaintiff and the putative class of money by means of material

misrepresentations, omissions and half-truths.  Plaintiff and the putative class reasonably relied upon these misrepresentations, omissions and half-truths, and, as a result of such reliance, directly and proximately suffered real and specifiable damages.

192.    Plaintiffs and subscribers/putative class members are "persons" within the meaning of 18 U.S.C. § 1961(3).

193.    The RICO Defendants are each a "person" within the meaning of 18 U.S.C. § 1961(3) separate from the enterprise in which they engage.).

**A.    Defendants' Conduct And Control of A RICO Enterprise**

194.    The RICO Defendants together with ROA/TRG at all relevant times constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4), or in the case of the individual RICO Defendants, persons employed or associated with the enterprise within the meaning of 18 U.S.C. § 1962(c), in that over a period of years they associated in fact although not as a legal entity, which enterprise came about by way of association in the formation and/or implementation of various agreements, *to wit*: insurance treaties, surplus support agreements and/or reinsurance agreements between the corporate Defendants, ROA and/or the members of  the RRG, as well as agreements to implement the Capital Call.  These individuals and entities associated together with the common purpose of engaging in the wrongful conduct set forth herein.

195.    Each Defendant participated directly in the operation or management of the enterprise and were associated in fact in furtherance of the enterprise.  The role of each Defendant in the fraudulent scheme and the enterprise is discussed in detail *supra*.  The enterprise described herein was formal and/or informal in nature.  The association of Defendants together furnished a vehicle for the commission of multiple predicate acts set out below in detail.

196.    The members of the enterprise have communicated throughout the class period

regarding the coordination and implementation of their fraudulent scheme to cover up and hide from State insurance regulators, insurance rating services, and current and potential policyholders, including the Plaintiff and subscribers/putative class members, the financial condition of ROA and the members of the RRG's as well as the secret side agreements as set out herein.  Further, each member of the enterprise (including each Defendant) worked with each other, and was aware of the other members of the enterprise and of those members' roles in the enterprise.  At the time each particular predicate act was committed, each member of the enterprise at that time was acting in concert with each other and with the group as a whole. Additionally, every member of the enterprise was operating under an agreement (explicit or otherwise) to further the fraudulent scheme set forth herein.

197.    The enterprise in which Defendants are engaged affects interstate commerce and/or its activities affect interstate commerce.  Defendants operate across state lines and throughout a majority of the United States.  Defendants send documents across state lines and collect and distribute revenue from the fraudulent scheme across state lines.

198.    Each member of the RICO enterprise, including each Defendant, is a separate and distinct legal entity which is free to act independently to advance its own interests, and which makes its own day-to-day business decisions. To the extent that any Defendant may be a related entity of another member of the enterprise (i.e. a subsidiary, parent, or sister corporation), the decision to operate as separate entities facilitated the wrongful conduct in question.

199.    The members of the enterprise are each distinct from the enterprise itself.  Each member is not conducting solely its own affairs, but is conducting the affairs of the enterprise aside and apart from its own affairs.  The members of the enterprise have banded together to accomplish the fraudulent scheme and pattern of racketeering activity discussed herein, which

could not have been accomplished by any member alone.

**B.    Defendants Engaged In A Pattern Of Racketeering Activity**

200.    To conduct the affairs of the enterprise, Defendants engaged in a widespread pattern of racketeering activity as defined by 18 U.S.C. § 1961(5).  This pattern of racketeering activity consists of more than two acts of racketeering activity as defined by 18 U.S.C. § 1961(1).  The most recent act of racketeering activity occurred within four years after the commission of the prior act.

201.    Defendants' acts of racketeering activity include hundreds, and likely thousands, of violations of the federal mail and wire fraud statutes, 18 U.S.C. § 1341 and 18 U.S.C. § 1343 (the "predicate acts").  These predicate acts were necessary for the RICO Defendants to carry out their fraudulent scheme, indeed, among other things, it was through these predicate acts that the RICO Defendants largely obtained Plaintiff and putative class members' contributions to the Capital call.

202.    The RICO Defendants associated with and through the enterprise acted tortiously and unlawfully within the meaning of 18 U.S.C. § 1962(c) by directing, managing, conducting, and/or participating, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), including a large number and a large variety of uses of the United States mail in violation of 18 U.S.C. § 1341 and wire services in violation of 18 U.S.C. § 1343 over a period of years within the time periods stated in 18 U.S.C. § 1961(5).

203.    The RICO Defendants' racketeering activity in furtherance of the enterprise included multiple violations of 18 U.S.C. § 1843 and 18 U.S.C. § 1344.

204.    Within the time periods stated in 18 U.S.C. § 1961(5), the enterprise was engaged

in or its activities affected interstate commerce in implementing and directing its racketeering activity, within the meaning of 18 U.S.C. § 1962(c), in that among other things it utilized the United States mail and the wire services to transmit information between States that *inter alia* falsely stated the financial status of ROA and the members of the RRGs to insurance regulators of various States and to insurance rating services and to current and potential policyholders in the interstate sale and promotion of insurance in multiple States.  The enterprise further utilized the United States mail, facsimile transmissions, email, internet and the wire service to transmit information regarding the Capital Call which included letters regarding each hospital's equity or capital accounts as well as other information regarding such Capital Call.  Furthermore, wire, facsimile, email, the internet and mail was used by the Managing and RICO Defendants to arrange and attend meetings regarding the Capital Call more specifically described herein.

205.    The RICO Defendants entered into an unlawful conspiracy in violation of 18 U.S.C. § 1962(d) to cover up and hide from State insurance regulators, insurance rating services, and current and potential policyholders, including the Plaintiff and subscribers/putative class members, the financial condition of ROA and the members of the RRG's as well as the secret side agreements as set out herein.

206.    The RICO Defendants each conspired to engage in the above-stated enterprises through the conduct of a pattern of racketeering activity (set forth herein) in violation of 18 U.S.C. § 1962.

207.    Further, the RICO Defendants aided and abetted each other in violating 18 U.S.C. § 1962, as set forth herein.

208.    Within the time periods stated in 18 U.S.C. 1961(5) and in furtherance of the enterprise and the said conspiracy, the RICO Defendants, ROA and other associates of the

enterprise did among other things:

    A.    Entered into the secret side agreements referred to above;

    B.    Falsely answered questionnaires from insurance rating services, such as and including A.M. Best; and

    C.    Supplied false information to insurance regulators and to current and potential policyholders, as set out herein.

209.    Specifically, Milliman and Sanders conspired to violate RICO and committed the predicate acts set out in paragraphs 38, 46, 72-73, 94-100, 116-118, 126-128, 143-166, 176-189, which the Plaintiffs/putative class adopt and incorporate herein.  Said acts were committed by Milliman and Sanders as part of the RICO conspiracy and enterprise in order to cover up to regulators, insurance rating services, and the Plaintiffs/putative class the true financial condition of ROA, which proximately caused damage to the Plaintiffs/putative class as set out herein.

210.    Within the time periods stated in 18 U.S.C. § 1961(5), Gen Re, ROA management and the individual RICO Defendants or certain of them, utilized the United States mail, e-mail, voice telephones, and telephone faxes to communicate with each other and with third parties for the purpose of carrying out the scheme of the enterprise and with insurance rating services in carrying out the scheme of the enterprise by misrepresenting the true financial condition of ROA and the members of the RRGs, which conduct constitutes the offense of mail fraud within the meaning of 18 U.S.C. § 1341 as to the use of the United States mail, and 18 U.S.C. § 1343 as to the use of e-mail, voice telephones and telephone faxes.

211.    As a result of the conduct and activities of the enterprise:

    A.    Excessive reinsurance commissions and excessive fees were paid by other Defendants, ROA or members of the RRGs or certain of them to Gen Re and/or its officials in exchange for very little reinsurance;

    B.    Illusory credits were reported by ROA and the members of the RRGs in their reports to insurance regulators and insurance rating services, which

caused the companies to falsely appear to be sufficiently solvent to accept new business, pay claims and sustain the regulated reserves necessary to continue to do business;

C.   A member of the RRGs and ROA/TRG sold insurance to the Plaintiffs and class members that was supposed to provide insurance coverage that was reinsured through ROA and Gen Re;

D.   ROA and the members of the RRGs were allowed to sell insurance and collect premiums after their true financial situation was such that under applicable law they should not have been allowed to do so;

E.   ROA and the members of the RRGs received a higher rating by insurance rating services than was their correct rating; and

F.   ROA collected, and the Plaintiffs paid, Capital Call contributions as set out in detail herein, and Plaintiffs lost their equity in ROA.

212.   The purpose of this fraudulent scheme is to cover up and hide from State insurance regulators, insurance rating services, and current and potential policyholders, including the Plaintiff and subscribers/putative class members, the financial condition of ROA and the members of the RRG's as well as the secret side agreements as set out herein through false and/or fraudulent pretenses.  This is in violation of 18 U.S.C. § 1341.

213.   Defendants also send and receive other writings (letters, contracts, checks, invoices and other paper) and sound communications (including but not limited to telephone calls, facsimile transmissions, and bank wire transfers) for the purpose of executing and attempting to execute a scheme to obtain Plaintiff and putative class members' money through false and/or fraudulent pretenses in violation of 18 U.S.C. § 1343.  Upon information and belief, Defendants regularly use e-mail, which is transmitted through the wires, to coordinate the fraudulent scheme amongst themselves.

214.   To the extent that any Defendant did not itself send writings in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, it causes these writings to be sent, or knowingly and

willfully aids and abets those violations.

215.     The multiple acts of racketeering activity are not isolated events.  They are part of a common and continuous pattern of unlawful and wrongful acts which has been ongoing for at least five years, and are a necessary part of the fraudulent scheme.   The separate acts of racketeering are related in that they have the same or similar intended victims: Plaintiff and the putative class. The separate acts of racketeering also have the same or similar purposes (to cover up and hide from State insurance regulators, insurance rating services, and current and potential policyholders, including the Plaintiff and subscribers/putative class members, the financial condition of ROA and the members of the RRG's as well as the secret side agreements as set out herein), results (the actual acquisition of Plaintiffs/putative class' Capital Call Contributions), participants (Defendants along with individuals and entities whose identities are currently not known, as detailed above) and methods of commission (the use of internet, email, wire, facsimile and mail).

### C.     Defendants Proximately And Directly Injured Plaintiff And The Putative Class

216.     Plaintiffs justifiably and reasonably relied to their detriment on the material misrepresentations and omissions by the RICO Defendants.  Likewise, insurance regulators and insurance rating services to whom the RICO Defendants also falsely directed their criminal scheme reasonably relied on the misrepresentations of the RICO Defendants by maintaining ROA's higher insurance rating and by not inflicting regulatory scrutiny on ROA and its affiliates.  Plaintiffs and putative class reasonably relied upon the ratings of insurance ratings services and also upon the approval of the various departments of insurance in making their Capital Call contributions.

217.     As a proximate result of the conduct of the RICO Defendants, the Plaintiffs and

the putative class suffered damages that can be quantified, that are continuing in nature, and that have not yet been fully ascertained, including damage in their business and/or their property in that they paid insurance premiums for insurance that has not been provided, in that they are without insurance for substantial time periods thereby requiring them to pay costs to defend claims against them, to pay judgments entered against them, to pay settlements of claims they ordinarily would have successfully defended, were required to pay larger premiums than otherwise would have been the case for new insurance covering subsequent time periods, incurred expenses for additional administrative time devoted to ROA's insolvency, incurred expenses resulting from loss of tail coverage, incurred expenses relating to obtaining replacement coverage and/or forming captive insurance companies, incurred attorney's fees as a result of ROA receivership (including attorney's fees relating to pursuit of claims in the ROA and RRG insolvency proceedings), incurred expenses related to an increase in premiums over market price for replacement coverage, lost their equity in ROA, and contributed millions in Capital Call payments.

218.    Defendants' wrongful acts proximately caused damage to Plaintiffs and putative class members' business and property.  Plaintiffs and putative class members were directly injured by the Defendants' racketeering activity.  Defendants' violation of 18 U.S.C. § 1961, *et seq*. (and of 18 U.S.C. § 1341 and 18 U.S.C. § 1343) was the but for cause of Plaintiffs and putative class members' injuries.

219.    By the acts of racketeering and the conduct of the scheme discussed above, Defendants acquired Plaintiffs and putative class members' Capital Call contributions.  Plaintiff and the putative class relied upon Defendants' misrepresentations, half-truths, and omissions by paying such Capital Call contributions.

220.   Plaintiff and putative class members were the direct and intended victims–as opposed to the indirect victims–of Defendants racketeering violations as Defendants' racketeering acts were targeted at Plaintiffs and putative class members who also paid the improper fees.

Wherefore the premises considered, Plaintiffs and subscribers/putative class members hereby demand compensatory and punitive damages in an amount to be proven at trial, treble damages, and attorneys' fees plus interest and costs.

### COUNT II

### CONSPIRACY TO VIOLATE SECTION 1962(c)
### OF THE FEDERAL RICO STATUTE
### (18 U.S.C. § 1962(d))

221.   Plaintiffs hereby adopt and incorporate herein by reference all prior paragraphs of this Complaint as if set out here in full.  To the extent necessary, this cause of action is pled in the alternative to Count I, *supra*.

222.   Defendants each conspired to violate Section 1962(c).  Each was a knowing, active, and willing member of this conspiracy.  The conspiracy took place from (at least) 1991 to 2003.  The object of the conspiracy was to conduct the fraudulent scheme set forth in detail herein, including (but not limited to) the use of fraudulent schemes, multiple instances of mail fraud and wire fraud, undisclosed insurance rebates and aggregate "caps" on reinsurance (at least some of which required the prior written approval of regulators, from whom the caps were concealed by Defendants, including Milliman among others), sham reinsurance agreements involving no substantial transfer of insurance risk, arbitrary reserve write-downs, conducting of the Capital Call and fraudulent financial transactions and reports, in order to cover up and hide from State insurance regulators, insurance rating services, and current and potential policyholders, including the Plaintiff and subscribers/putative class members, the financial

condition of ROA and the members of the RRG's as well as the secret side agreements as set out herein and to strip equity and Capital Call contributions from the Plaintiff and putative class members.

223.    In furtherance of this conspiracy, Defendants each undertook certain overt acts including, but not limited to, the use of fraudulent schemes, multiple instances of mail fraud and wire fraud, undisclosed insurance rebates and aggregate "caps" on reinsurance (at least some of which required the prior written approval of regulators, from whom the caps were concealed by Defendants, including Milliman among others), sham reinsurance agreements involving no substantial transfer of insurance risk, arbitrary reserve write-downs, conducting of the Capital Call and fraudulent financial transactions and reports.  Additionally, included among these overt acts, are acts of mail and wire fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343. Details of some of these violations, including the date, purpose, and persons directly involved, are set forth above.  Information as to other violations is currently within Defendants' exclusive possession or control.

224.    Defendants each agreed to commit the predicate acts of mail and wire fraud set forth herein, to participate in the fraudulent scheme set forth herein, and to participate in the pattern of racketeering activity set forth herein.  At a minimum, each Defendant agreed to the commission of at least two predicate acts by someone associated with the RICO enterprise. Defendants each knew that the predicate acts were a part of a pattern of racketeering activity, and in no way were isolated events.

225.    Plaintiff and putative class members have been directly and proximately damaged by Defendants' conspiracy as set out above.  Additionally, Plaintiff and putative class members were directly injured by the Defendants' racketeering activity. Plaintiff and each putative class

member relied upon Defendants' misrepresentations, half-truths, and omissions by paying money for the Capital Call as set out above.  Defendants have each obtained money wrongfully from such payment.  Plaintiff and putative class members were the direct and intended victims of Defendants' conspiracy, racketeering activity, enterprise, and fraudulent scheme, and Defendants intentionally targeted Plaintiff and putative class members.

## COUNT III

## FRAUDULENT MISREPRESENTATION

226.    Plaintiffs hereby adopt and incorporate herein by reference all prior paragraphs of this Complaint as if set out here in full.

227.    As previously described, prior to the KHAT and CHAT's merger with ROA in 1997, KHAT and CHAT's Kentucky hospitals were already reinsured through Gen Re.  As part of this relationship, Gen Re provided guidance and direction to KHAT and CHAT's Board of Directors regarding underwriting claims and other advice related to financial and management issues.  This was an open-ended relationship in which Gen Re contributed considerable input. KHAT and CHAT trusted and relied on the advice of Gen Re.  When KHAT and CHAT were considering their merger with ROA in 1997, members of KHAT and CHAT's Board of Directors consulted agents and employees of Gen Re seeking their advice as to whether they were familiar with ROA and whether they had a favorable opinion of ROA.  Agents and representatives of Gen Re told KHAT and CHAT that it would be beneficial for them to merge with ROA because ROA was stable financially and was a sound operation with a good management structure.  Gen Re's representations regarding ROA were false and Gen Re made them in full knowledge of their falsity and/or with reckless disregard for their truth or falsity and with the intent that the

Plaintiffs rely upon them.  The Kentucky Plaintiffs did, in fact, rely on these misrepresentations to their detriment by merging with ROA.

228.    Also, Coastal Insurance Association ("CIA"), an Alabama group self-insurer for hospital professional and general liability insurance for the Alabama Hospital Association Trust ("AHAT"), merged with ROA in 2000.  The Alabama Plaintiffs obtained professional, general and umbrella liability insurance with ROA through the CIA/AHAT self-insurer.  Prior to the CIA/AHAT's merger with ROA in 2000, AHAT's Alabama hospitals were already reinsured through Gen Re.  As part of this relationship, Gen Re provided guidance and direction to AHAT's Board of Directors regarding underwriting claims and other financial and management advice.  This was an open-ended relationship in which Gen Re contributed considerable input.  AHAT trusted and relied on the advice of Gen Re.  When CIA/AHAT was considering the merger with ROA in 2000, members of AHAT's Board of Directors consulted agents and employees of Gen Re and Milliman and Sanders seeking their advice as to whether they were familiar with ROA and whether they had a favorable opinion of ROA.  Agents and representatives of Gen Re as well as Milliman and Sanders told CIA/AHAT that it would be beneficial to merge with ROA because ROA was stable financially and was a good operation with a good management structure.  Gen Re, Milliman and Sanders' representations regarding ROA were false and Gen Re, Milliman and Sanders made them in full knowledge of their falsity and/or with reckless disregard for their truth or falsity and with the intent that the Plaintiffs rely upon them.  The Alabama Plaintiffs did, in fact, rely on these misrepresentations to their detriment by merging with ROA.

229.    By 2001, ROA was in dire financial straits.  This fact was known to the ROA management and the RICO Defendants.

230.    As previously described herein, the Defendants, individually and by and through their agents, representatives or employees, made multiple materially false misrepresentations to the Plaintiffs and subscribers/putative class members upon which the Plaintiffs justifiably and reasonably relied to their detriment.  The Defendants specifically used actuarial numbers and figures provided by Milliman and Sanders that Milliman and Sanders knew would be shown by the Defendants to the Plaintiffs to solicit the Capital Call contributions at issue.  To that end, in In addition to the numerous false statements described in detail above, representatives, agents and employees of the Defendants made the following material, false representations to the Plaintiffs and subscribers/putative class members at subscribers meetings in June of 2002 in Louisville, Kentucky, Jackson, Mississippi and Montgomery, Alabama, in the form of numerous letters, correspondence, informational packets, oral statements and presentations which were presented to the Plaintiffs and subscribers/putative class members in an effort to solicit capital contributions for the Capital Call which was set to take place on or around June 30, 2002:

(a)     Plaintiffs' capital contributions would strengthen ROA's surplus position;

(b)     Plaintiffs' capital contributions would allow ROA to continue to provide for a viable medical insurance market;

(c)     ROA's financial troubles and losses were caused by independent conditions in the liability insurance market and medical malpractice industry that were beyond the control of ROA;

(d)     Plaintiffs' capital contributions would solidify ROA and make it solvent;

(e)     That there were no conflicts of interest within TRG and its managed companies;

(f)      That the relationships between TRG senior management were in the best interest of the insured hospital subscribers, including the Plaintiffs and subscribers/putative class members;

(g)      That positive financial and management changes would be made within ROA/TRG after and as a result of capital contribution funds being received;

(h)      That ROA's reported financial status at the time of the Capital Call was accurate and legitimate and was the result of proper and legitimate actuarial and accounting means;

(i)       That the Plaintiffs' and subscribers/putative class members' capital contributions would be added directly to their ROA Equity Account Balance;

(j)      That the Plaintiffs' and subscribers/putative class members' capital contributions would earn investment income under the ROA investment policy;

(k)      That ROA's 2000 and 2001 operating losses were the result of higher loss activity stemming from severity of losses to strengthening of 2001 reserves;

(l)      That meetings with A.M. Best provided that with a successful capital-raising campaign, ROA's rating would improve;

(m)      That new actions had been taken beginning in 2000 through 2002 to improve ROA's operating results;

(o)      That the Plaintiffs' capital contributions would not be stolen, misappropriated, mishandled or otherwise used for purposes other than what was represented to the Plaintiffs.

(p)      That the Capital Call plan would put ROA close to the 400% Risk Based Capital level;

(q)      That ROA's Risk Based Capital surpluses were diminished as a result of operating results, equity distributions and decreased investment returns;

(r)    That by raising the necessary Capital Call funds, ROA's A.M. Best rating would change and ROA's capital position would be stronger;

(s)    That Defendant General Reinsurance would "step in the shoes" of ROA and cover all claims in the event ROA was unable; and

(t)    That Defendant General Reinsurance would bolster ROA's solvency.

231.    Said representations were false, and were either negligently and/or wantonly and/or willfully and/or recklessly and/or intentionally presented to the Plaintiffs and subscribers/putative class members by the Defendants in full knowledge of their falsity and/or with reckless disregard for their truth or falsity and with the intent that the Plaintiffs rely upon them.

232.    Plaintiffs and subscribers/putative class members did not know these representations were false, and relied upon the present, material representations that were presented by the Defendants.  Plaintiffs and subscribers/putative class members had a right to rely on said representations.

233.    Moreover, with respect to the material misrepresentations communicated by Defendants Milliman and Sanders for this Count, Plaintiffs/putative class specifically adopt and incorporate the allegations contained in paragraphs 158 through 166, and 176 through 189, *supra*, as if specifically set out herein.

234.    As a proximate result of the fraud committed by the Defendants, the Plaintiffs and subscribers/putative class members were caused to suffer damages.  In particular, Plaintiffs and subscribers/putative class members collectively contributed millions of dollars in or around June of 2002 for the Capital Call.  Plaintiffs and subscribers/putative class members further continued to pay premiums and renew insurance coverage with ROA and its related entities.  Plaintiffs and

subscribers/putative class members have also suffered damages that are continuing in nature and as yet have not been fully ascertained.

235.     The conduct of the Defendants was willful and/or wanton and/or reckless and/or intentional such as that the imposition of punitive damages is justified and warranted. Defendants expressly authorized the representations and/or, knew or should have known these representations were being made at the time.

Wherefore the premises considered, Plaintiffs and subscribers/putative class members hereby demand compensatory and punitive damages from the Defendants, jointly and severally in an amount to be determined at trial, plus interest and costs.

## COUNT IV

## FRAUDULENT SUPPRESSION/FAILURE TO DISCLOSE

236.     Plaintiffs hereby adopt and incorporate herein by reference all prior paragraphs of this Complaint as if set out here in full.

237.     As previously described herein, the Defendants either intentionally, recklessly, negligently or wantonly suppressed multiple material facts from the Plaintiffs and subscribers/putative class members that the Defendants had a duty to disclose.  In addition to the numerous material facts described in detail throughout the entirety of this complaint, Plaintiffs specifically allege that the following material facts were suppressed by the Defendants from the Plaintiffs subscribers/putative class members despite a duty to fully disclose the same and all material times thereafter:

(a)     Plaintiffs' capital contributions would not strengthen ROA's surplus position;

(b)     Plaintiffs' capital contributions would not allow ROA to continue to provide for a viable medical insurance market;

(c)     ROA's financial troubles and losses were not caused by independent conditions in the liability insurance market and medical malpractice industry that were beyond the control of ROA; and in fact ROA's financial situation was caused by the acts of the Defendants as specifically described in this complaint;

(d)     Plaintiffs' capital contributions would not solidify ROA and make it solvent;

(e)     That there were conflicts of interest within TRG and its managed companies;

(f)     That the personal and professional relationships between TRG senior management were not in the best interest of the insureds, including the Plaintiffs and subscribers/putative class members;

(g)     That positive financial and management changes would not be made within ROA/TRG after and as a result of capital contributions funds being received;

(h)     That ROA's financial status at the time of the Capital Call was not reported accurately and legitimately and was not the result of proper and legitimate actuarial and accounting means;

(i)     That the Plaintiffs' and subscribers/putative class members' capital contributions would not be added directly to their ROA Equity Account Balance;

(j)     That the Plaintiffs' and subscribers/putative class members' capital contributions would not earn investment income under the ROA investment policy;

(k)     That ROA's 2000 and 2001 operating losses were not the result of higher loss activity stemming from severity of losses to strengthening of 2001 reserves;

(l)     That meetings with A.M. Best did not provide that with a successful capital-raising campaign, ROA's rating would improve;

(m)      That no actions had been taken beginning in 2000 through 2002 to improve ROA's operating results;

(o)      That the Plaintiffs' and subscribers/putative class members' capital contributions would be stolen, misappropriated, mishandled and otherwise used for purposes other than what was represented;

(p)      That the Capital Call plan would not put ROA close to the 400% Risk Based Capital level;

(q)      That ROA's Risk Based Capital surpluses were not diminished as a result of operating results, equity distributions and decreased investment returns; and

(r)      That by raising the necessary Capital Call funds, ROA's A.M. Best rating would not change and ROA's capital position would not be stronger;

(s)      That Defendant General Reinsurance would not "step in the shoes" of ROA and cover all claims in the event ROA was unable;

(t)      That Defendant General Reinsurance would not bolster ROA's solvency.

(u)      Gen Re had no real reinsurance obligation for ROA;

(v)      Gen Re had ceded its reinsurance obligation to FVR, an alien and underfunded Bermuda corporation;

(w)      Defendants had fraudulently manipulated ROA's RBC;

(x)      ROA's surplus was overstated by millions of dollars;

(y)      That there was a secret side agreement whereby General Reinsurance had little or no liability for reinsurance; and

(z)      That ROA did not have a good management structure and that it was not was financially stable.

238.    Defendants suppressed said material facts, despite a duty to fully disclose same because they were in positions of vastly superior knowledge concerning ROA as compared with the Plaintiffs, and the Defendants all had access to ROA officers and employees, and as regards ROA, and ROA inside information, and thus access to information that the Plaintiffs did not have and in the ordinary course of its activities would not obtain.  All the Defendants knew, or recklessly disregarded, or were reckless in not knowing, of the misrepresentations of material fact and omissions of material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, that occurred in their communications with the Plaintiffs, and the Defendants acted knowing of, or recklessly disregarding the severe risk of, loss to the Plaintiffs that would be proximately caused by Defendants' acts and omissions described herein.

239.    But for the suppressed material facts, Plaintiffs and subscribers/putative class members would not have paid money for the above-mentioned policies and/or made the Capital Call contributions described herein.

240.    Further, at all relevant times, the Defendants knew that the secret side agreements and their false statements to insurance regulators and to insurance rating services were material as to regulatory decisions, as to the assignment of ratings, and as to decisions to purchase and renew insurance.

241.    The Defendants knew that the secret side agreements were required to be disclosed to insurance regulators, insurance rating services and current and potential policyholders, including Plaintiffs and subscribers/putative class members.

242.    Defendants intended that insurance regulators, insurance rating services, and current and potential policyholders, including Plaintiffs and subscribers/putative class members,

rely upon the false representations and Defendants suppressed material facts set out herein.

243.   The insurance regulators, insurance rating services, including A.M. Best, and current and potential policyholders, including Plaintiffs and subscribers/putative class members, reasonably relied upon the false representations and suppressed material facts and reasonably assumed there were no side agreements.

244.   All of the Defendants who were in possession of material undisclosed facts and willfully or knowingly or recklessly concealed them, acting in concern and conspiracy, engaged in the aforesaid omission, and therefore deceptive and manipulative and fraudulent acts, practices, and courses of business with the intent to take advantage of the position of inferior knowledge and ignorance of the true facts on the part of the Plaintiffs, and in order to take advantage of Plaintiffs' trust and confidence in the Defendants, and with the intent to defraud the Plaintiffs, and with a profit-seeking motive on the Defendants' part.

245.   By virtue of the foregoing premises, the Defendants' conduct in question constituted fraud.

246.   Moreover, with respect to the liability of Defendants Milliman and Sanders for this Count arising from their failure to disclose material facts to the Plaintiffs/putative class, Plaintiffs/putative class specifically adopt and incorporate the allegations contained in paragraphs 158 through 166, and 176 through 189, *supra*, as if specifically set out herein.

247.   With respect to the liability of Defendant PwC and Stephani for this Count arising from their failure to disclose material facts to the Plaintiffs/putative class, Plaintiffs/putative class specifically adopt and incorporate the allegations contained in paragraphs 167 through 189, *supra*, as if specifically set out herein.

248.   As the intended and expected result of their fraud, Defendants have profited and

benefited from the sale of professional liability insurance to the Plaintiffs and subscribers/putative class members in that the Defendants have received large sums of money by way of insurance premiums, Capital Call contributions, commission, salaries and other financial benefits, which they otherwise would not have received.

249.     Defendants have voluntarily accepted and retained the profits and benefits derived from the Plaintiffs and subscribers/putative class members with full knowledge and awareness that as a result of the Defendants' fraudulent conduct, the Plaintiffs and subscribers/putative class members were wrongfully deprived of the funds that were the source of said profits and benefits.

250.     As a proximate result of the conduct of the Defendants, the Plaintiffs and subscribers/putative class members suffered damages that are continuing in nature and have not yet been fully ascertained, including damages set out in detail above.

251.     The conduct of the Defendants was willful and/or wanton and/or reckless and/or intentional such as that the imposition of punitive damages is justified and warranted.

Wherefore the premises considered, Plaintiffs and subscribers/putative class members hereby demand compensatory and punitive damages from the Defendants, jointly and severally in an amount to be determined at trial, plus interest and costs.

## COUNT V

## CONSPIRACY

252.     Plaintiffs hereby adopt and incorporate herein by reference all prior paragraphs of this Complaint as if set out here in full.

253.     The Defendants actively and deliberately conspired with one another to defraud the Plaintiffs/putative class, to commit the torts alleged herein, and to engage in and accomplish

the acts described herein, all of which that have proximately resulted in damages to the Plaintiffs and subscribers/putative class members.

254.    In addition, the conduct of the Defendants demonstrates a willful entering into a conspiracy the object of which was the violation of numerous statutory provisions that regulate the business of insurance as well as violations of the common law of the states.

255.    The conduct of the Defendants was willful and/or wanton and/or reckless and/or intentional such as that the imposition of punitive damages is justified and warranted.

Wherefore the premises considered, Plaintiffs and subscribers/putative class members hereby demand compensatory and punitive damages from the Defendants, jointly and severally in an amount to be determined at trial, plus interest and costs.

## COUNT VI

## UNJUST ENRICHMENT

256.    Plaintiffs hereby adopt and incorporate herein by reference all prior paragraphs of this Complaint as if set out here in full.

257.    From the acts, events and circumstances described herein, the Defendants have been individually and collectively enriched in an unjust manner.

Wherefore the premises considered, Plaintiffs and subscribers/putative class members hereby demand a constructive trust, along with compensatory and punitive damages, from the Defendants, jointly and severally in an amount to be determined at trial, plus interest and costs.

## COUNT VII

## NEGLIGENCE

258.    Plaintiffs hereby adopt and incorporate herein by reference all prior paragraphs of this Complaint as if set out here in full.254.  At the aforesaid times and places, the Defendants

negligently committed the aforementioned acts relating to the insurance coverage and Capital Call contributions for Plaintiffs and subscribers/putative class members.  Defendants owed a duty to the Plaintiffs and subscribers/putative class members and breached said duty.

259.    With respect to the liability of Defendant PwC and Stephani for this Count, the Plaintiffs/putative class state the following:  PwC and Stephani are liable for their conduct described in paragraphs 167 through 189, *supra*, which amounts to the negligent dissemination of inaccurate and false financial reports to the Plaintiffs/putative class, which were foreseeable third parties for whose benefit and guidance PwC and Stephani supplied the information.  *See Boykin v. Arthur Andersen & Co.*, 639 So. 2d 504 (Ala. 1994); *Restatement (Second) of Torts* § 552.

260.    Moreover, with respect to the liability of Defendants Milliman and Sanders for this Count, Plaintiffs/putative class specifically adopt and incorporate the allegations contained in paragraphs 158 through 166, and 176 through 189, *supra*, as if specifically set out herein.

261.    As a proximate consequence of the Defendant's negligence, Plaintiffs and subscribers/putative class members were injured and damaged as alleged above.

Wherefore the premises considered, Plaintiffs and subscribers/putative class members hereby demand compensatory damages from the Defendants, jointly and severally in an amount to be determined at trial, plus interest and costs.

## COUNT VIII

## WANTONNESS

262.    Plaintiffs hereby adopt and incorporate herein by reference all prior paragraphs of this Complaint as if set out here in full.

263.   At the aforesaid times and places, the Defendants wantonly committed the aforementioned acts relating to the insurance coverage and Capital Call contributions for Plaintiffs and subscribers/putative class members.

264.   Moreover, with respect to the liability of Defendants Milliman and Sanders for this Count, Plaintiffs/putative class specifically adopt and incorporate the allegations contained in paragraphs 158 through 166, and 176 through 189, *supra*, as if specifically set out herein.

265.   With respect to the liability of Defendants PwC and Stephani for this Count, the Plaintiffs/putative class state the following:  PwC and Stephani are liable for their conduct described in paragraphs 167 through 189, *supra*, which amounts to the intentional and/or reckless dissemination of inaccurate and false financial reports to the Plaintiffs/putative class, which were foreseeable third parties for whose benefit and guidance PwC and Stephani supplied the information.  *See Boykin v. Arthur Andersen & Co.*, 639 So. 2d 504 (Ala. 1994); *Restatement (Second) of Torts* § 552.

266.   As a proximate consequence of the Defendants' wantonness, Plaintiffs and subscribers/putative class members were injured and damaged as set forth herein.

Wherefore the premises considered, Plaintiffs and subscribers/putative class members hereby demand compensatory and punitive damages from the Defendants, jointly and severally in an amount to be determined at trial, plus interest and costs.

## COUNT IX

## CONVERSION/MISAPPROPRIATION

267.   Plaintiffs hereby adopt and incorporate herein by reference all prior paragraphs of this Complaint as if set out here in full.

268.    By and through the conduct described above, Defendants converted, and/or misappropriated Plaintiffs' and subscribers/putative class members' premium payments and other contributions, including Capital Call contributions, for their own use and benefit.  Such premium payments and other contributions, including Capital Call contributions, are capable of being identified.

269.    The Defendants' conduct was willful, intentional and oppressive.

270.    The above-described wrongful conduct of Defendants combined and concurred to proximately cause Plaintiffs and subscribers/putative class members to suffer damages.

Wherefore the premises considered, Plaintiffs and subscribers/putative class members hereby demand compensatory and punitive damages from the Defendants, jointly and severally in an amount to be determined at trial, plus interest and costs.

## COUNT X

## VIOLATION OF THE KENTUCKY CONSUMER PROTECTION ACT

271.    Plaintiffs hereby adopt and incorporate herein by reference all prior paragraphs of this Complaint as if set out here in full.

272.    By and through the conduct described above, Defendants are in violation of the Kentucky Consumer Protection Act, K'S §367.110, *et. seq.*

273.    The Defendants' conduct was willful, intentional and oppressive.

274.    The above-described wrongful conduct of Defendants combined and concurred to proximately cause Plaintiffs and subscribers/putative class members to suffer damages.

Wherefore the premises considered, Plaintiffs and subscribers/putative class members hereby demand compensatory and punitive damages from the Defendants, jointly and severally in an amount to be determined at trial, plus interest and costs.

## COUNT XI

## BREACH OF FIDUCIARY DUTIES

275.    Plaintiffs hereby adopt and incorporate herein by reference all prior paragraphs of this Complaint as if set out here in full.

276.    Defendants owed a fiduciary duty to Plaintiffs and subscribers/putative class members to obtain insurance that conformed to the representations made by the Defendants, to appropriate and handle the Plaintiffs' and subscribers/putative class members' premiums and Capital Call contributions in a proper manner, and to provide honest and accurate financial and actuarial data, conclusions and recommendations regarding the financial situation at ROA/TRG. A fiduciary duty or confidential relationship arose between Defendants and Plaintiffs and subscribers/putative class members, because Plaintiffs and subscribers/putative class members placed special trust and confidence in Defendants to handle their insurance matters in an appropriate manner and for the purposes contemplated, and due to the nature of entities to which Plaintiffs and subscribers/putative class members paid premiums and Capital Call contributions.

277.    Defendants had a duty to act in the best interests of the Plaintiffs and subscribers/putative class members, or at least not to act in a manner which was directly adverse to the interests of the Plaintiff and subscribers/putative class members.

278.    The actions and/or inactions of the Defendants as described herein constitute a breach of fiduciary duty.

279.    Defendants breached their fiduciary duties which proximately caused Plaintiffs and subscribers/putative class members to suffer damages.

Wherefore the premises considered, Plaintiffs and subscribers/putative class members hereby demand compensatory and punitive damages from the Defendants, jointly and severally in an amount to be determined at trial, plus interest and costs.

## COUNT XII

### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

280.    Plaintiffs hereby adopt and incorporate herein by reference all prior paragraphs of this Complaint as if set out here in full.

281.    As described above, the Kentucky and Alabama hospital Plaintiffs had reinsurance relationships with Gen Re via KHAT, CHAT and CIA/AHAT.  By virtue of these reinsurance relationships, Gen Re provided guidance and direction to KHAT, CHAT and CIA/AHAT's Board of Directors regarding underwriting and other financial issues related to insurance.  Prior to their merger with ROA in 1997 and 2000 respectively, Gen Re said it would be beneficial to merge with ROA because ROA was stable financially and was a good operation with a good management structure.

282.    These reinsurance agreements between Gen Re and the Alabama and Kentucky Hospital Plaintiffs carried with them a covenant of good faith and fair dealing.  Gen Re breached this covenant by provided wrongful, improper and unsound advice, given that ROA was not solvent financially and did not maintain a good management structure, a fact which Gen Re was fully aware.

283.    As described above, the Alabama hospital Plaintiffs had a consulting and advisory relationship with Milliman and Sanders.  By virtue of this relationship, Milliman and Sanders

provided guidance and direction to the Alabama hospitals with respect to the merger with ROA. Prior to its merger with ROA in 2000, Milliman and Sanders represented to the Alabama hospital Plaintiffs that it would be beneficial to merge with ROA because ROA was stable financially and was a good operation with a good management structure.

284.    This consulting and advisory relationship between Milliman and Sanders and the Alabama Hospital Plaintiffs carried with it a covenant of good faith and fair dealing.  Milliman and Sanders breached this covenant by providing wrongful, improper and unsound advice, given that ROA was not solvent financially and did not maintain a good management structure, a fact which Milliman and Sanders were fully aware of.

285.    As a proximate consequence of Gen Re, Milliman and Sanders' conduct, Plaintiffs and subscribers/putative class members were injured and damaged as alleged above.

Wherefore the premises considered, Plaintiffs and subscribers/putative class members hereby demand compensatory damages from the Defendants, jointly and severally in an amount to be determined at trial, plus interest and costs.

## **JURY DEMAND**

PLAINTIFFS HEREBY DEMAND TRIAL BY JURY ON ALL ISSUES

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment, on their behalf and on behalf of a certified class, ordering, adjudging and decreeing that:

1.      This action shall be certified as a class action under Rule 23 of the Federal Rules of Civil Procedure;

2.      Plaintiffs and subscribers/putative class members be awarded actual and punitive damages, in an amount to be determined at trial, on each Count of the Complaint;

3.      Plaintiffs and subscribers/putative class members be awarded compensatory, treble and punitive damages as allowed by 18 U.S.C. 1961, *et. seq.*;

4.      Plaintiffs and subscribers/putative class members be awarded attorney's fees and treble damages as allowed by law, including those allowable under the Kentucky Consumer Protection Act, K'S §367.110, *et. seq*;

5.      Plaintiffs and subscribers/putative class members be awarded reasonable attorneys' fees;

6.      Plaintiffs and subscribers/putative class members be awarded pre-judgment and post-judgment interest from the Defendants;

7.      Plaintiffs and subscribers/putative class members be awarded the costs of suit, including discretionary costs; and

8.      Plaintiffs and subscribers/putative class members be awarded such other and further relief as the Court deems just and proper under the circumstances.

/s Robert G. Methvin, Jr.
ROBERT G. METHVIN, JR.
JAMES M. TERRELL
J. MATTHEW STEPHENS
Lead Attorneys for Policyholder Plaintiffs

**OF COUNSEL**:
**McCallum,  Methvin & Terrell, P.C.**
2201 Arlington Avenue South
Birmingham,  AL  35205
(205) 939-0199  telephone
(205) 939-0399  facsimile

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing has been electronically transmitted, pursuant to paragraph 4.b of the Amended Case Management Order, to all counsel of record on this 1st day of July, 2011:

s/Robert G. Methvin, Jr.
OF COUNSEL